446 F.3d 25
 Martha KRISTIAN and James D. Masterman, Plaintiffs, Appellees,
v.
COMCAST CORPORATION; Comcast Mo Group, Inc.; Comcast Cable Holdings, LLC; Comcast Cable Communications Holdings, Inc.; Comcast Cable Communications, Inc.; and Comcast Holdings Corporation, Defendants, Appellants, AT & T Broadband, Defendant.
Jack Rogers and Paul Pinella, Plaintiffs, Appellees,
v.
Comcast Corporation and AT & T Broadband, Defendants, Appellants.
 No. 04-2619.
 No. 04-2655.
 United States Court of Appeals, First Circuit.
 Heard September 14, 2005.
 Decided April 20, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jaime A. Bianchi, with whom Christopher M. Curran, George L. Paul, Noah A. Brumfield, and White & Case LLP; and Christopher F. Robertson and Seyfarth Shaw LLP were on brief, for appellants.
 Alan Gilbert, with whom Stacey L. Mills, Samuel D. Heins, David Woodward, Jessica N. Servais, and Heins Mills & Olson, P.L.C; John P. Zavez, Noah Rosmarin, and Adkins, Lelston & Zavez, P.C.; and Barry Barnett, John Turner, and Susman Godfrey LLP were on brief, for appellees.
 Before LIPEZ and HOWARD, Circuit Judges, and RESTANI, Judge.*
 LIPEZ, Circuit Judge.
 
 
 1
 This appeal requires us to evaluate the enforceability of arbitration agreements that Comcast, a cable television provider, invoked against a group of its subscribers, who have sued it for violations of state and federal antitrust laws. Concluding that the arbitration agreements did not have retroactive effect, the district court ruled that the subscribers could not be compelled to arbitrate their antitrust claims. In so ruling, the district court did not have to reach a number of other issues raised by the subscribers in opposition to Comcast's demand for arbitration.
 
 
 2
 We disagree with the district court's interpretation of the arbitration agreements. Their language does have retroactive effect. This ruling requires us to address the other arguments raised by the subscribers against the enforceability of the arbitration agreements. We find that Comcast provided adequate notice of the arbitration agreements. However, we conclude that the provision of the arbitration agreements barring the recovery of treble damages is invalid as applied to the subscribers' federal antitrust claims because it prevents the vindication of a federal statutory right. Similarly, we conclude that the provisions of the arbitration agreements barring the recovery of attorney's fees and costs and barring class arbitration are invalid because they prevent the vindication of statutory rights under state and federal law. Nevertheless, the arbitration agreements contain savings clauses that provide for severance of these invalid provisions. With these provisions severed, the arbitration can go forward. Thus, we reverse the district court's ruling that the subscribers cannot be compelled to arbitrate their antitrust claims.
 
 I.
 
 3
 Plaintiffs-Appellees James D. Masterman, Paul Pinella, Jack Rogers, and Martha Kristian (collectively, "Plaintiffs") are Boston area subscribers of cable services obtained from Defendant-Appellant Comcast Corporation ("Comcast"). Plaintiffs subscribed for cable services through Comcast predecessor companies in 1987, 1991, 1994, and 1999, respectively. Their two complaints — one in state court, one in federal court — allege that the prices that they have been paying for cable services are inflated as a result of anticompetitive practices on the part of Comcast and AT & T Broadband, Comcast's predecessor-in-interest.
 
 
 4
 The complaints allege that Comcast has been consolidating its hold on markets and territories through agreements to swap or exchange cable television assets ("swapping agreements").[1] The complaints specifically reference two swapping agreements, one in 1999 and another in 2001. Plaintiffs Kristian and Masterman allege that Comcast engages in conduct that excludes, prevents, or interferes with competition, including Comcast's refusal to provide programming access to competitors either before or after Comcast merged with AT & T Broadband in 2002. Plaintiffs seek certification of class actions comprised of individuals who subscribed to Comcast cable services in the Boston area at anytime from December 1999 to the present.
 
 
 5
 When Plaintiffs first subscribed for cable services, none of their service agreements contained an arbitration provision. In 2001, Comcast began including an arbitration provision in the terms and conditions governing the relationship between Comcast and its subscribers. These terms and conditions are contained, in part, in notices that inform subscribers at the time of cable installation — and at least annually thereafter — of the terms and conditions governing their subscriptions ("Policies & Practices"). Comcast included the Policies & Practices with each Boston area subscriber's invoice as a billing stuffer during the November 2001 billing cycle.
 
 
 6
 The version of the Policies & Practices mailed in November/December 2002 contained an arbitration agreement that, at first blush, substantially differed from the one in the 2001 Policies & Practices. The arbitration agreement contained in the November/December 2003 Policies & Practices remained unchanged from 2002. Comcast seeks to compel arbitration pursuant to the language of the arbitration agreements contained in the 2002/2003 Policies & Practices; the 2002/2003 arbitration agreements are the focus of this appeal.
 
 II.
 
 7
 Rogers and Pinella filed a complaint ("Rogers" complaint) against Comcast and AT & T Broadband in Massachusetts state court, alleging a cause of action under the Massachusetts Antitrust Act, Mass. Gen. Laws. Ch. 93. Comcast removed this action to the U.S. District Court for the District of Massachusetts. Contemporaneously, Kristian and Masterman filed a complaint ("Kristian" complaint) against Comcast, as well as several other Comcast entities, in the U.S. District Court for the District of Massachusetts, alleging causes of action under the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.
 
 
 8
 Pursuant to the arbitration agreements at issue, Comcast filed motions to compel arbitration in both cases. Plaintiffs in Rogers presented several arguments to the district court in opposition to Comcast's motion to compel arbitration (Plaintiffs' opposition to Comcast's motion to compel arbitration in Kristian was in all relevant respects identical to the opposition filed by the Rogers' Plaintiffs). They asserted, inter alia, that the facts that gave rise to their complaint occurred before the existence of the 2002/2003 arbitration agreements; therefore, the agreements did not apply to their antitrust claims. Plaintiffs also contended that the arbitration agreements prevented them from vindicating their causes of action under federal antitrust law, and that they violated public policy and were unconscionable under state law. Concluding that the language of the 2002/2003 arbitration agreements did not have retroactive effect, the district court ruled that they did not apply to the state antitrust claims at issue. The district court did not reach Plaintiffs' other arguments.
 
 
 9
 The district court applied its decision in Rogers to Kristian as both complaints were based on the same underlying facts, the arbitration agreements at issue in both cases were identical, and the district court's reasoning applied equally to both complaints. Thereafter, Comcast filed an interlocutory appeal contesting the district court's denial of its motions to compel arbitration. Both cases are currently stayed, pending resolution of this appeal. As the district court's order refusing to compel arbitration applied to both the Rogers and Kristian complaints, the two cases have been consolidated for purposes of this appeal.
 
 
 10
 We evaluate the district court's denial of a motion to compel arbitration de novo. Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 551 (1st Cir. 2005). However, in deciding this appeal, "[w]e are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record." InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir.2003).
 
 III.
 
 11
 As noted, the district court found that the arbitration agreements in the 2002/2003 Policies & Practices did not apply retroactively. Below, in relevant part, is the 2002/2003 arbitration language at issue, set forth in bold face as it appears in the agreements:
 
 
 12
 IF WE ARE UNABLE TO RESOLVE INFORMALLY ANY CLAIM OR DISPUTE RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE SERVICES PROVIDED, WE HAVE AGREED TO BINDING ARBITRATION EXCEPT AS PROVIDED BELOW. YOU MUST CONTACT US WITHIN ONE (1) YEAR OF THE DATE OF THE OCCURRENCE OF THE EVENT OR FACTS GIVING RISE TO A DISPUTE . . . OR YOU WAIVE THE RIGHT TO PURSUE A CLAIM BASED UPON SUCH EVENT, FACTS OR DISPUTE.
 
 
 13
 THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS YOUR STATE'S LAWS PROVIDE OTHERWISE.
 
 
 14
 The district court focused its attention on the first sentence of the first paragraph, in particular the phrase "the services provided":
 
 
 15
 The inclusion of the word "the" before "services provided" indicates to the Court that the services being discussed are those specifically provided under "this agreement." It is also noteworthy that "the services provided" is mentioned immediately after "this agreement" without any qualifying language whatsoever that would indicate that the services do not refer to the agreement itself. These two factors, acting in combination, lead the Court to believe that the phrase "the services provided" refers to specific services provided under the particular subscriber agreement at issue, and does not refer to services in a general sense.
 
 
 16
 The district court buttressed this interpretation of the arbitration clause with two other points.
 
 
 17
 First, the district court cited cases where certain contractual language meant retroactive effect. See, e.g., Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir.1982)("any controversy between us arising out of your business") (over'd on other grounds by Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)); Beneficial Nat'l Bank, U.S.A. v. Payton, 214 F.Supp.2d 679, 689 (S.D.Miss.2001)(collecting cases); Whisler v. H.J. Meyers & Co., Inc., 948 F.Supp. 798, 802 (N.D.Ill.1996)("`any controversy arising out of or relating to any of my accounts'"). The district court also cited cases where the arbitration provision explicitly addressed retroactivity. See, e.g., Boulet v. Bangor Sec., 324 F.Supp.2d 120, 125 n. 4 (D.Me 2004) (discussing retroactive effect of agreement that stated "`whether entered into prior, on or subsequent to the date hereof'"). Because the 2002/2003 arbitration agreements were not phrased like the agreements in any of the cases it cited, the district court found that the ambiguity of the agreements should be interpreted against Comcast in light of the policy of construing adhesion contracts strictly against the drafter. The district court expressly found that the arbitration agreements were contracts of adhesion.[2] See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 n. 16 (1st Cir.1999).
 
 
 18
 Second, the district court highlighted the presence of a statute of limitations provision found in the sentence immediately after the sentence containing the phrase "the services provided".[3] In the district court's view, if the arbitration agreements had retroactive effect, the statute of limitations provision would act as a waiver of all disputes arising one-year prior to the arbitration provision in the 2002 Policies & Practices. Such a waiver would be a "significant departure from the parties' prior agreements, which did not even contain an arbitration provision."[4] The district court stated that "there is no indication that the phrase `the services provided' was intended to have such a dramatic effect on the parties' pre-existing contractual relationships."
 
 
 19
 We cannot agree with the district court's reading of the arbitration agreements. As an initial matter, the district court ignored a large number of cases where arbitration agreements contained language specifically excluding retroactive effect. For example, in Security Watch, Inc. v. Sentinel Systems, Inc., 176 F.3d 369 (6th Cir.1999), the Sixth Circuit found no retroactivity in an arbitration clause that read "`[t]he parties shall follow these dispute resolution processes in connection with all disputes, controversies or claims . . . arising out of or relating to the Products furnished pursuant to this Agreement or acts or omissions of Distributor or AT & T under this Agreement.'" Id. at 372 (emphasis added). In Choice Security Systems, Inc. v. AT & T Corp., 141 F.3d 1149 (Table), 1998 WL 153254 (1st Cir. Feb.25, 1998) (unpublished), we found no retroactivity in an arbitration provision that read "all disputes. . . arising out of or relating to the products furnished pursuant to this Agreement." Id. at *1 (emphasis added); see also In re Universal Serv. Fund Billing Practices Litg., 300 F.Supp.2d 1107, 1124 (D.Kan.2003); Coffman v. Provost Umphrey Law Firm, L.L.P., 161 F.Supp.2d 720, 723, 726-27 (E.D.Tex.2001). In these cases, the language in the arbitration clause unmistakably limits arbitration to what is covered by the agreements — e.g., "pursuant to this Agreement." These arbitration clauses do not contain the additional language found in the clauses at issue here — "any claim or dispute arising out of this agreement or the services provided" (emphasis added). Read most naturally, the phrase "or the services provided" covers claims or disputes that do not arise "out of this agreement" and hence are not limited by the time frame of the agreements.
 
 
 20
 In rejecting this natural reading, the district court, as noted, placed an undue amount of emphasis on the article "the" in the phrase "the services provided", which appears immediately after the reference to "this agreement". ("If we are unable to resolve informally any claim or dispute related to or arising out of the agreement or the services provided, we have agreed to binding arbitration except as provided below.") In effect, this reading adds to the phrase "the services provided" words of limitation — "under this agreement". There is no justification for rewriting the arbitration provision in this way. Additionally, because the word "services" is defined in the Policies & Practices,[5] it is grammatically correct to include the definite article "the" before "services" in order to signify that "services" refer to "services" as defined in the text, rather than services in a general sense.
 
 
 21
 Moreover, contrary to the district court's finding, the 2002/2003 arbitration agreements did not effect a substantial change in the terms governing a potential arbitral proceeding between Comcast and its subscribers. The district court found that the 2002/2003 arbitration agreements, if they were enforced, would represent a significant shift in the contractual relationship. Specifically, the district court noted that "[t]his conclusion [of non-retroactivity] is supported by the fact that the [2002/2003] arbitration provisions contained a strict limitations period." However, the 2001 Policies & Practices included a limitations period identical to the one found in the 2002/2003 arbitration clauses.[6] The 2001 Policies & Practices also explicitly contained language that addressed retroactivity, mirroring the language of the arbitration agreements in the decisions cited above:
 
 
 22
 ANY AND ALL DISPUTES ARISING BETWEEN YOU AND THE COMPANY. . . WHETHER ARISING BEFORE OR AFTER THE EFFECTIVE DATE MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION. THIS INCLUDES ANY AND ALL DISPUTES BASED ON ANY PRODUCT, SERVICE OR ADVERTISING CONNECTED TO THE PROVISION OR USE OF THE SERVICE.
 
 
 23
 In a side-by-side comparison of the 2001 and the 2002/2003 Policies & Practices, the only major difference between the two versions is that certain provisions, such as a limitation on remedies and a bar on the use of class mechanisms, are located in different sections. In the 2001 version, the bar on class arbitration is located in its own offset subsection — subsection (b) — under section 10, entitled "Dispute Resolution"; in the 2002/2003 version, similar language exists as the second paragraph of section 10, entitled "Mandatory and Binding Arbitration" and is not offset. Also, the 2001 version contained, as subsection (c) of section 10, "Dispute Resolution," a remedies limitation specific to arbitration, in addition to the general remedies limitation, section 8, entitled "Limited 30-Day Warranty and Limitation of Liability". In the 2002/2003 version, the arbitration-specific remedies limitation of the 2001 version has no analogue. Instead, the 2002/2003 version uses the general remedies limitation. Finally, the 2002/2003 iteration adds a provision specifically permitting severance of the class mechanism bar. Aside from those changes, nearly every other section of the 2002/2003 Policies & Practices is identical to the 2001 version, with only a few other minor changes to language.
 
 
 24
 In this respect, the district court made an apt observation but drew the wrong conclusion because it did not incorporate the 2001 Policies & Practices into its analysis: "There is no indication that the phrase `the services provided' was intended to have such a dramatic effect on the parties' pre-existing contractual relationships." Precisely. The 2002/2003 Policies & Practices merely re-ordered and restructured the 2001 Policies & Practices, changing the language detailing the rules governing arbitration and eliminating some redundancy in the 2001 version. It was never intended to make significant changes in the pre-existing relationship.
 
 
 25
 Furthermore, the district court incorrectly relied on the state contract principle requiring contracts of adhesion to be construed strictly against the drafter. Ordinarily, given the strong federal policy of resolving any doubts concerning arbitrability in favor of arbitration, any ambiguity created by the change in language from 2001 to 2002/2003 should be resolved in favor of finding arbitrability. See Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). While the district court acknowledged this principle — as proffered by Comcast — in its discussion, it chose not to apply it. Instead, it concluded that "[i]n light of the fact that the subscriber agreements at issue in this case are unquestionably adhesion contracts, this Court considers it appropriate to hold the defendants to the words they chose to use in drafting the arbitration provisions."
 
 
 26
 To support this choice, the district court cited Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15 (1st Cir. 2000). There, we acknowledged that "[o]ne important constraint is that the federal policy favoring arbitration does not totally displace ordinary rules of contract interpretation. Thus, numerous courts have employed the tenet of contra proferentem in construing ambiguities in arbitration agreements against the drafters." Id. at 25. The petitioners in Paul Revere:
 
 
 27
 concede[d] that the contra proferentem tenet properly applies to such questions as whether a party has entered an arbitration agreement or whether an arbitration agreement is enforceable vel non [;] they nonetheless maintain[ed] that it ha[d] no application to questions touching upon the scope of an arbitration agreement.
 
 
 28
 Id. In response, we held that "generally speaking, the presumption in favor of arbitration applies to the resolution of scope questions. . . . A scope question arises when the parties have a contract that provides for arbitration of some issues and it is unclear whether a specific dispute falls within that contract." Id. (internal citations and quotation marks omitted).
 
 
 29
 Here, Plaintiffs argue that the arbitration agreements are not enforceable as to their particular antitrust claims because the arbitration agreements do not apply retroactively. Plaintiffs concede that the arbitration agreements are generally valid. Put another way, Plaintiffs argue that their antitrust claims do not fall within the scope of the arbitration agreements as a result of non-retroactivity. Plaintiffs are in fact raising a scope question. Thus, the general rule cited in Paul Revere applies. Where the federal policy favoring arbitration is in tension with the tenet of contra proferentem for adhesion contracts, and there is a scope question at issue, the federal policy favoring arbitration trumps the state contract law tenet.[7] For this reason as well, the district court erred in ruling that the arbitration agreements did not apply retroactively to the antitrust claims of Plaintiffs.
 
 
 30
 Therefore, we conclude that the 2002/2003 arbitration agreements, like their 2001 predecessor, do have retroactive effect. Thus, we must address the other arguments advanced by Plaintiffs in opposition to the enforcement of the arbitration agreements.
 
 IV.
 
 31
 Plaintiffs assert that "Comcast's arbitration clauses are also unenforceable because Comcast failed to give Plaintiffs advance 30 day notice of the arbitration provisions as required by federal law." The district court did not address this issue because it found the retroactivity issue dispositive. Specifically, Plaintiffs assert that Comcast did not provide the requisite 30-day notice to subscribers as required by 47 C.F.R. §§ 76.1602 & 76.1603,[8] which interpret and implement a portion of the Cable Television and Consumer Protection Act, 47 U.S.C. § 552(c).
 
 
 32
 The statute and regulations do not specify the type of notice required. Indeed, the statute establishes a flexible notice standard. A company may provide notice "using any reasonably written means at [the cable company's] sole discretion." 47 U.S.C. § 552(c) (2000). Here, Comcast provided notice by setting out the entire text of the new subscription agreement. Although this may not be ideal notice because it does not draw attention to the changes contained in the 2002/2003 agreements from the 2001 agreement, Comcast was not required to provide any more notice than it did. Rather, Comcast need only provide notice that is a "reasonable written means" in order to satisfy the requirements of 47 U.S.C. § 552(c). While the outer boundary of what is reasonable may not be certain, the notice provided by Comcast here meets the standard.
 
 
 33
 Additionally, Plaintiffs assert that Comcast did not provide adequate notice in compliance with the Policies & Practices itself, which requires that Comcast will "provide you [the subscriber] notice of the change and its Effective Date." The Policies & Practices does not contain an explicit effective date, notifying a subscriber when the provisions contained in the Policies & Practices begin to apply. However, the Policies & Practices states in its first paragraph that it was distributed by Comcast to subscribers as notice "in order to comply with the Company's obligations under the rules of the Federal Communications Commission." Thus, the Policies & Practices incorporates by reference the Federal Communications Commission's ("FCC") 30-day advance notice regulation, 47 C.F.R. § 76.1603(b). Again, Comcast could have complied more clearly with its self-imposed effective date notice requirement, but this compliance is good enough. Furthermore, neither the statute nor the FCC's regulations require that subscribers receive any explicit statement about the effective date of new terms. We are satisfied that Comcast provided adequate notice.[9]
 
 V.
 
 34
 Plaintiffs contend that the 2002/2003 arbitration agreements should be invalidated because many of their provisions prevent Plaintiffs from vindicating their statutory rights. Plaintiffs' "vindication of statutory rights" arguments reflect "the presumption that arbitration provides a fair and adequate mechanism for enforcing statutory rights." Rosenberg, 170 F.3d at 14; see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)("[S]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.") Unless the arbitral forum provided by a given agreement provides for the fair and adequate enforcement of a party's statutory rights, the arbitral forum runs afoul of this presumption and loses its claim as a valid alternative to traditional litigation.
 
 
 35
 Plaintiffs assert that the arbitration agreements prevent them from vindicating their statutory rights because the agreements: (1) provide for limited discovery; (2) establish a shortened statute of limitations period; (3) bar recovery of treble damages; (4) prevent recovery of attorney's fees; and (5) prohibit the use of class mechanisms. Before undertaking our analysis of the five provisions in the arbitration agreements that Plaintiffs find objectionable, we must explain some preliminary considerations that inform the analysis of each of their vindication of statutory rights claims.
 
 
 36
 A. "Questions of Arbitrability"
 
 
 37
 i. The Supreme Court trilogy
 
 
 38
 a. Howsam
 
 
 39
 In analyzing a given vindication of statutory rights claim, we must first decide who the proper decision maker is for such a claim: an arbitrator or a court. The touchstone for deciding this question is Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). In Howsam, the Court "focuse[d] upon an arbitration rule of the National Association of Securities Dealers (NASD)" involving a six-year statute of limitations. Id. at 81, 123 S.Ct. 588. Dean Witter had asked the district court "to declare that the dispute was `ineligible for arbitration' because it was more than six years old." Id. at 82, 123 S.Ct. 588. The Supreme Court had to decide "whether a court or an NASD arbitrator should apply the [NASD's] rule to the underlying controversy," id. at 81, 123 S.Ct. 588—the type of threshold decision we must make here for each of Plaintiffs' vindication of statutory rights claims.
 
 
 40
 The Court began its analysis with the observation that "`arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Id. at 83, 123 S.Ct. 588 (quoting Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). The Court continued:
 
 
 41
 Although the Court has also long recognized and enforced a liberal federal policy favoring arbitration agreements, it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.
 
 
 42
 Id. at 83, 123 S.Ct. 588 (internal citations omitted). This statement requires close scrutiny because it includes references to three distinct elements: (1) the federal policy favoring arbitration agreements, which has nothing to do with the intent of the parties that have entered into an arbitration agreement; (2) the exception to this policy — based on the presumed intent of the contracting parties — that the question of whether the parties have submitted a particular dispute to arbitration (the "question of arbitrability") is an issue for judicial determination; and (3) a clear and unmistakable expression of actual intent by the contracting parties that they want an arbitrator rather than a court to decide whether they have submitted a particular dispute to arbitration.
 
 
 43
 This second element, involving the presumed intent of the contracting parties favoring judicial determination of whether a particular dispute has been submitted to arbitration, is described by the Court as "the interpretive rule". The Court in Howsam had to decide "whether application of the NASD time limit provision falls into the scope of this . . . interpretive rule." Id. at 83, 123 S.Ct. 588. If the Court decided that the interpretive rule applied, a court would decide the applicability of the six-year statute of limitations. If the Court decided that the interpretive rule did not apply, the general policy favoring arbitration would govern, and the arbitrator would decide the applicability of the statute of limitations.
 
 
 44
 In rejecting the application of the interpretive rule to the dispute over the applicability of the statute of limitations, the Court explained that it would be wrong to view too broadly the presumption that the parties to an arbitration agreement intend that a court rather than an arbitrator will decide whether the parties have submitted a particular dispute to arbitration. As the Court explained:
 
 
 45
 Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule [that a court rather than an arbitrator should decide whether the parties have submitted a particular dispute to arbitration], the phrase "question of arbitrability" has a far more limited scope. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.
 
 
 46
 Id. at 83-84, 123 S.Ct. 588 (internal citations omitted). The cornerstone here is an assumption about the intent of the contracting parties to an arbitration agreement, in "the kind of narrow circumstances where contracting parties would likely have expected a court to have decided the gateway matter." Id. at 83-84, 123 S.Ct. 588. In these narrow circumstances, the gateway dispute poses a "question of arbitrability", meaning that a court, rather than an arbitrator, decides whether the parties have submitted the particular dispute to arbitration.
 
 
 47
 Howsam described two categories of disputes where we presume that courts rather than arbitrators should resolve the gateway dispute: (1) disputes "about whether the parties are bound by a given arbitration clause"; and (2) disagreements "about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Id. at 84, 123 S.Ct. 588. Examples of the former include whether an arbitration contract binds parties that did not sign the agreement; and whether an arbitration agreement survived a corporate merger and bound the subsequent corporation. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Examples of the latter include whether a labor-management layoff controversy was covered by the arbitration clause of a collective-bargaining agreement; and whether a clause providing for arbitration of various grievances covers claims for damages for breach of a no-strike agreement. See AT & T Technologies, Inc. v. Comm. Workers of Am., 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).
 
 
 48
 The Court also "found the phrase `question of arbitrability' not applicable in other kinds of general circumstances where parties would likely expect that an arbitrator would decide the gateway matter." Howsam, 537 U.S. at 84, 123 S.Ct. 588. For example, "`[P]rocedural' questions which grow out of the dispute and bear on its final disposition" are presumptively not for the judge, but for an arbitrator to decide. Howsam, 537 U.S. at 84, 123 S.Ct. 588 (quoting John Wiley, 376 U.S. at 557, 84 S.Ct. 909). So too, the presumption is that the arbitrator should decide "`allegation[s] of waiver, delay, or a like defense to arbitrability.'" Id. (quoting Moses H. Cone, 460 U.S. at 24-25, 103 S.Ct. 927). Citing the comments to the Revised Uniform Arbitration Act of 2000, the Court elaborated on this statement, stating:
 
 
 49
 in the absence of an agreement to the contrary, issues of substantive arbitrability. . . are for a court to decide and issues of procedural arbitrability, i.e. whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.
 
 
 50
 Id. at 85, 123 S.Ct. 588 (citing Rev. Un. Arb. Act § 6 and cmt. 2) (original emphasis omitted).
 
 
 51
 Finally, the Howsam decision invoked the concept of comparative expertise:
 
 
 52
 the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy.. . .
 
 
 53
 Id. at 85, 123 S.Ct. 588. Based on this reasoning, the Court concluded that "the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called `questions of arbitrability.' And the strong pro-court [as decision maker] presumption as to the parties' likely intent does not apply." Id. at 85-86, 123 S.Ct. 588.
 
 
 54
 b. Pacificare and Bazzle
 
 
 55
 In the wake of Howsam, the Court decided two additional cases, PacifiCare Health Systems, Inc. v. Book, 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003), and Green Tree Financial Corp. v. Bazzle, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), that must also inform our analysis of the proper decision maker for the vindication of statutory rights claims before us. In PacifiCare, a group of physicians brought claims against a number of health-care management organizations ("HMOs"), including a RICO claim. The HMOs sought to compel arbitration. See PacifiCare, 538 U.S. at 402-03, 123 S.Ct. 1531. The physicians opposed arbitration on the ground that they could not obtain "meaningful relief" in arbitration for their claims under the RICO statute, which authorizes treble damages, because the arbitration provision prohibited the awarding of punitive damages. Id. at 403, 123 S.Ct. 1531. The HMOs asserted that there was no question of arbitrability, "and hence [the dispute] should have been decided by an arbitrator, rather than a court, in the first instance." Id. at 403, 123 S.Ct. 1531. They also asserted in the alternative that if there was a question of arbitrability, the remedial limitation at issue did not require invalidation of the arbitration agreements. Id. at 404, 123 S.Ct. 1531. The Court ultimately reached neither of the HMOs' positions, concluding "that it would be premature for us to address these questions at this time." Id. at 404, 123 S.Ct. 1531. That was so because of a crucial ambiguity in the arbitration agreements.
 
 
 56
 The arbitration agreements at issue in PacifiCare explicitly prohibited the recovery of punitive damages, not treble damages. Id. at 405, 123 S.Ct. 1531. This fact, coupled with existing precedent, convinced the Court that there was too much legal ambiguity to conclude that there was a question of arbitrability; as a result, the Court compelled arbitration. The Court reasoned that:
 
 
 57
 since we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract . . . . the proper course is to compel arbitration.
 
 
 58
 Id. at 407, 123 S.Ct. 1531. Because the underlying meaning of the arbitration agreement was unclear with respect to the availability of treble damages, it was also unclear whether that agreement conflicted with the RICO statute. Since such a conflict might threaten the validity of the arbitration agreements, "we should not, on the basis of `mere speculation' that an arbitrator might interpret these ambiguous agreements in a manner that casts their enforceability into doubt, take upon ourselves the authority to decide the antecedent question of how the ambiguity is to be resolved." Id. at 406-07, 123 S.Ct. 1531. Given the presumption in favor of arbitration, a court should not foreclose the operation of that presumption by deciding that there is a question of arbitrability when there is the possibility that an arbitrator's decision in the first instance would obviate the need for judicial decision making. See id. at 407, 123 S.Ct. 1531 n. 2.
 
 
 59
 In Bazzle, decided soon after PacifiCare, the Court once again confronted the significance of ambiguity in an arbitration agreement. Bazzle concerned "contracts between a commercial lender and its customers, each of which contains a clause providing for arbitration of all contract-related disputes." 539 U.S. at 447, 123 S.Ct. 2402. The Supreme Court of South Carolina held that the arbitration clauses were silent as to whether arbitration could take place on a class basis, and that South Carolina law permitted class arbitration under those circumstances. Id. The Supreme Court was "faced at the outset with a problem concerning the contracts' silence. Are the contracts in fact silent, or do they forbid class arbitration?" Bazzle, 539 U.S. at 447, 123 S.Ct. 2402. The lender asserted that the arbitration language prohibited class arbitration; the Court disagreed. It held that because the literal terms of the agreement did not resolve the class arbitration question, i.e., the terms were ambiguous, the case "present[ed] a disputed issue of contract interpretation." Id. at 450, 123 S.Ct. 2402. Drawing on Howsam, the Court noted that "the question here — does not fall into [the] narrow exception" described in Howsam. 539 U.S. at 452, 123 S.Ct. 2402. That is, "[i]n certain limited circumstances, courts assume that the parties intended courts, not arbitrators, to decide a particular arbitration-related matter.... They include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Id. The contract interpretation question posed in Bazzle did not fall into this narrow exception:
 
 
 60
 Rather the relevant question here is what kind of arbitration proceeding the parties agreed to. That question does not concern a state statute or judicial procedures. It concerns contract interpretation and arbitration procedures. Arbitrators are well situated to answer that question.
 
 
 61
 539 U.S. at 452-53, 123 S.Ct. 2402 (internal citations omitted).
 
 
 62
 In essence, the Bazzle court applied principles derived from Howsam and Pacificare. From Howsam, it considered and rejected the interpretive rule (an exception to the federal policy favoring arbitration) that courts assume that the parties intended courts, not arbitrators, to decide certain arbitration-related matters. Confronted with a dispute about what the arbitration language meant with respect to the availability of class arbitration (an uncertainty analogous to the ambiguity addressed in PacifiCare), the Court concluded that an arbitrator, not a judge, should decide what kind of arbitration proceeding the parties had agreed to.
 
 
 63
 ii. Applying the "trilogy"
 
 
 64
 To reiterate, Plaintiffs assert that the arbitration agreements prevent them from vindicating their statutory rights in the following ways. The agreements: (1) provide for limited discovery; (2) establish a shortened statute of limitations period; (3) bar recovery of treble damages; (4) prevent recovery of attorney's fees; and (5) prohibit class arbitration. Comcast contends that none of these assertions raise a question of arbitrability.
 
 
 65
 We must first decide whether an arbitrator or a court should resolve each of the vindication of statutory rights claims, i.e., whether a question of arbitrability is actually raised. That inquiry requires us to apply the principles we have culled from the Court's decisions in Howsam, PacifiCare, and Bazzle. Then, if a question of arbitrability is indeed raised by any of Plaintiffs' assertions, we must decide "the merits" of that assertion. By "the merits" we mean the question of whether the particular challenge raised by Plaintiffs to the arbitration agreements is a valid defense to the demand for arbitration. By "the merits" we do not mean the "underlying dispute," i.e., Plaintiffs' antitrust claims against Comcast.
 
 
 66
 B. Howsam's Clear Questions of Arbitrability
 
 
 67
 We conclude that none of Plaintiffs' claims falls into either of the two categories of clear questions of arbitrability detailed in Howsam. Plaintiffs describe their position generally as follows: "the Policies & Practices as a whole is valid. However, as applied to our antitrust claims, the arbitration agreement contained therein prevents us from obtaining statutorily guaranteed relief; therefore, the arbitration clause is invalid as applied to our antitrust claims."
 
 
 68
 The two types of clear questions of arbitrability described by the Court in Howsam are: (1) disputes about whether the parties are bound by a given arbitration clause; and (2) disputes about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy. See Howsam, 537 U.S. at 84, 123 S.Ct. 588. While earlier we categorized Plaintiffs' non-retroactivity claim as an argument about the "scope" of the arbitration agreements, their vindication of statutory rights claims do not fit into either of Howsam's categories. The examples provided by the Howsam court bear this out. Id. at 84, 123 S.Ct. 588. The former category concerns whether there is a binding arbitration agreement at all, e.g., are non-signatories of an arbitration agreement bound by it? Here, there is no question that the Policies & Practices, which includes the arbitration provisions, establishes a valid contractual relationship between Comcast and each of its subscribers.[10] Plaintiffs do not challenge generally the validity of the Policies & Practices, the requirement to arbitrate, or the five particular rules governing arbitration here. Rather, Plaintiffs rely on the specific circumstances of their case, i.e., their antitrust claims, in challenging Comcast's demand for arbitration.
 
 
 69
 The second Howsam category also does not describe Plaintiffs' claims. That category involves disputes over whether a particular type of controversy is covered by a concededly valid arbitration agreement. Here, Plaintiffs do not assert that the arbitration provisions of the Policies & Practices do not apply to antitrust claims. Rather, Plaintiffs assert that arbitration subject to the provisions at issue shields Comcast from antitrust liability, and hence conflicts with the statutes providing for such liability.
 
 
 70
 In short, Howsam's two categories of clear questions of arbitrability do not tell us whether Plaintiffs have raised questions of arbitrability. Still, even without the benefit of a dispositive Supreme Court precedent, there are useful guides in the precedents we have discussed and in others.
 
 C. Limited Discovery
 
 71
 The language in the arbitration agreements addressing discovery states that "Moreover, participating in arbitration may result in limited discovery." Plaintiffs contend that the language constraining discovery prevents them from obtaining the amount of discovery that they could expect to receive if discovery were conducted in the courts. But the Supreme Court has already foreclosed limited discovery as a ground for opposing the enforcement of an arbitration clause. In Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court confronted this very argument in the context of an age discrimination arbitration dispute. The Court stated that "[i]t is unlikely, however, that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and antitrust claims," and rejected the plaintiff's discovery argument. Id. at 31, 111 S.Ct. 1647 (emphasis added). Given this precedent, there is no need to decide anew whether limited discovery raises a question of arbitrability. It does not. Moreover, the Court's decision in Gilmer conforms to the interpretive principles the Court detailed in Howsam, PacifiCare and Bazzle. Any dispute over discovery would be procedural in nature, and therefore left for an arbitrator to resolve.
 
 D. Limitations period
 
 72
 The Sherman Antitrust Act, 15 U.S.C. § 15b, and the Massachusetts Antitrust Act, Mass. Gen. Law. ch. 93, § 13, provide a four-year limitations period for antitrust claims. In direct conflict with the statutory limitations period, the 2002/2003 arbitration agreements state that "you must contact us within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute . . . or you waive the right to pursue a claim based upon such event, facts or dispute." Plaintiffs oppose arbitration of their antitrust claims based on the basis of this direct conflict between the antitrust statutes and the arbitration provisions.
 
 
 73
 It is tempting to rely on the precedent established in Howsam — where the Court ruled that an arbitrator is the proper decision maker for disputes concerning the applicability of the arbitrator's own time limits — to conclude that this conflict does not pose a question of arbitrability. See Howsam, 537 U.S. at 85-86, 123 S.Ct. 588. The temptation to rely on Howsam is buttressed by our own precedent, specifically Marie v. Allied Home Mortgage Corp., 402 F.3d 1 (1st Cir.2005). In Marie, we confronted a limitations clause contained in an arbitration agreement itself, rather than in the arbitrator's governing rules. Id. at 11. Here, we are also faced with a statute of limitations contained in a valid arbitration agreement. However, there is one significant difference between the situation we face and the circumstances in Howsam and Marie, which prevents us from simply applying here the rule established in those cases.
 
 
 74
 In both Howsam and Marie, the limitations period did not conflict with any other statute of limitations. See Howsam, 537 U.S. at 81-82, 123 S.Ct. 588; Marie, 402 F.3d at 4-6. In Howsam, the question was whether the arbitrator's own time limit of six years applied to a dispute allegedly brought outside of the six-year window. See Howsam, 537 U.S. at 81-82, 123 S.Ct. 588. In Marie, the question was whether one of the parties had complied with the 60-day time limit set forth in the arbitration agreement. See Marie, 402 F.3d at 11. In other words, in neither case was the statute of limitations in conflict with a statutory limitations period applicable to the particular claims at issue. Instead, in Howsam and Marie there were questions of whether a statute of limitations applied to a particular factual circumstance. That is a different type of question than the one we face here, which is whether a statute of limitations found in the arbitration agreement must yield to a statutorily mandated statute of limitations.
 
 
 75
 Nevertheless, we are not without some guidance from these decisions. In particular, in Marie, after noting that a dispute over a statute of limitations "is the sort of procedural prerequisite that is presumed to be for the arbitrator," we also explained that:
 
 
 76
 While the time limit in Howsam was in the arbitrator's own rules rather than in the contract itself, this makes no difference. The arbitrator might be expected to have comparative expertise in determining the meaning of these sorts of contractual limitations provisions.... And ... consideration of this kind of procedural provision may entangle the court in issues that go properly to the merits of the dispute, which are for the arbitrator.
 
 
 77
 Marie, 402 F.3d at 11 (emphasis added). Comcast points out that both of Plaintiffs' complaints allege antitrust violations committed by Comcast before it promulgated the 2002/2003 Policies & Practices. But Comcast argues that the complaints are actually based on ongoing injury, rather than discrete events in the past. While Comcast raises this argument to challenge the view that it seeks retroactive application of the arbitration agreements,[11] we can still consider the relevance of the ongoing injury inquiry to the question of arbitrability.
 
 
 78
 Ongoing injury has traditionally been understood to toll a statute of limitations under certain circumstances. See, e.g., Roemmich v. Eagle Eye Development, LLC, 386 F.Supp.2d 1089, 1094 (D.N.D. 2005); Achee v. Port Drum Co., 197 F.Supp.2d 723, 735-36 (E.D.Tex.2002); Geddes v. County of Kane, 121 F.Supp.2d 662, 666 (N.D.Ill.2000). To determine: (1) whether Plaintiffs in fact suffer from an ongoing injury as a result of Comcast's allegedly illegal acts; and (2) whether such an injury, if it exists, tolls the statute of limitations contained in the Policies & Practices, would require an examination of the "merits of the case", i.e., the facts, the province of the arbitrator. See Marie, 402 F.3d at 11. Moreover, the statute of limitations defense is an affirmative defense. See Fed.R.Civ.P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense.") Affirmative defenses often involve factual questions that do touch on the merits of a case. Indeed, Howsam placed "`allegation[s] of waiver, delay, or a like defense to arbitrability'" squarely in the purview of the arbitrator. 537 U.S. at 84, 123 S.Ct. 588 (quoting Moses H. Cone, 460 U.S. at 24-25, 103 S.Ct. 927). For these reasons, we conclude that Plaintiffs' challenge to the statute of limitations contained in the 2002/2003 Policies & Practices does not raise a question of arbitrability.
 
 E. Treble damages
 
 79
 The 2002/2003 Policies & Practices states in relevant part:
 
 
 80
 IN NO EVENT SHALL WE OR OUR EMPLOYEES OR AGENTS HAVE ANY LIABILITY FOR PUNITIVE, TREBLE, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES.... SUCH LIMITATION OF LIABILITY APPLIES IN ALL CIRCUMSTANCES, REGARDLESS OF WHETHER SUCH DAMAGES MAY BE AVAILABLE UNDER APPLICABLE LAW, AND THE PARTIES HEREBY WAIVE THEIR RIGHTS, IF ANY, TO RECOVER ANY SUCH DAMAGES.
 
 
 81
 At first blush, the language of the first paragraph contravenes the remedial language set forth in the Sherman Act and the Massachusetts Antitrust Act, which provide explicitly for the recovery of treble damages. 15 U.S.C. § 15(a);[12] Mass. Gen. Laws ch. 93, § 12.[13] The language in the Policies & Practices "strips" Plaintiffs of a broad array of damages remedies. See generally, David S. Schwartz, Understanding Remedy-Stripping Arbitration Clauses: Validity, Arbitrability, and Preclusion Principles, 38 U.S.F. L.Rev. 49, 56 (2003) (explaining "remedy-stripping"). Relying on the Supreme Court's decision in PacifiCare, Comcast asserts that questions concerning the applicability of remedies-stripping provisions in arbitration clauses do not present questions of arbitrability.
 
 
 82
 Because the language of the federal and state antitrust statutes on the award of treble damages varies — federal law uses the word "shall", Massachusetts law uses the word "may" — we conduct a separate inquiry as to each.
 
 
 83
 i. Plaintiffs' federal antitrust claims
 
 
 84
 a. The question of arbitrability
 
 
 85
 With respect to Plaintiffs' federal antitrust claims, Comcast's reliance on Pacificare is misplaced. As explained earlier, the Court in Pacificare reasoned that:
 
 
 86
 since we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract.... [T]he proper course is to compel arbitration.
 
 
 87
 PacifiCare, 538 U.S. at 407, 123 S.Ct. 1531. The Court decided that the uncertainty of whether the remedies limitation in the arbitration agreement actually conflicted with the RICO statute meant that the arbitrator should construe the remedies limitation in the first instance, and then decide in light of that construction whether the arbitration agreement is enforceable. In other words, when there is ambiguity about the scope of a remedies limitation of an arbitration agreement, the arbitrator will decide the question of enforceability in the first instance. See id.
 
 
 88
 Unlike the situation in PacifiCare, there is no doubt that the language of the 2002/2003 arbitration agreements and the language of 15 U.S.C. § 15(a) directly conflict. The plain language of the 2002/2003 arbitration agreements excludes any type of damages remedy that is not simple, compensatory damages. PacifiCare— which holds that courts should not "presume that an arbitrator will construe an ambiguous arbitration agreement in a manner that renders the agreement unenforceable," Schwartz, supra at 77-78 — does not apply here. There is nothing ambiguous about the remedies-stripping provision at issue.
 
 
 89
 Comcast also finds support for its position in some dicta from MCI Telecomm. Corp. v. Matrix Communications Corp., 135 F.3d 27 (1st Cir.1998), a case in which the appellee asserted that the arbitration clause at issue was invalid because the arbitration rules it referred to foreclosed remedies such as multiple damages. In response, we stated that "this argument must be brought to the arbitrator because it does not go to the arbitrability of the claims but only to the nature of available relief." Id. at 33 n. 12.
 
 
 90
 PacifiCare casts considerable doubt on the accuracy of our dicta[14] in MCI that a limitation on remedies cited as a basis for a vindication of statutory rights claim cannot pose a question of arbitrability for a court to decide. Implicit in the PacifiCare analysis is the proposition that if the remedies limitation in the arbitration agreement posed a clear conflict with the remedies available in the RICO statute, that clear conflict would pose a question of arbitrability. In other words, in the face of a vindication of statutory rights claim based on such a clear conflict, the court would decide the question of the enforceability of the arbitration clause in the first instance. As one commentator has observed:
 
 
 91
 [t]he Court apparently assumed, arguendo, that a remedy limitation barring treble damages would render the RICO claims non-arbitrable. But the Court asserted that it would not presume that an arbitrator will construe an ambiguous arbitration agreement in a manner that renders the agreement unenforceable. Instead, "the proper course is to compel arbitration" and, presumably, see how the arbitrator actually construes the agreement.
 
 
 92
 Schwartz, supra at 77-78 (quoting PacifiCare, 538 U.S. at 407, 123 S.Ct. 1531).
 
 
 93
 Here, however, unlike PacifiCare, there is no initial ambiguity for an arbitrator to construe with respect to the federal antitrust claim. There is a clear conflict between the language of the arbitration agreements and the federal antitrust statutes. Moreover, as we shall explain in the next section of this opinion, the consequences of this conflict are equally clear. That is, under federal law, the remedies provided by the antitrust statute cannot be contractually waived.[15] In light of the clarity of this conflict and the clarity of the legal consequences, Plaintiffs' challenge to the remedies limitation in the arbitration provisions of the 2002/2003 Policies & Practices raises a question of arbitrability. We will resolve in the first instance the claim that the damages limitation prevents arbitration of Plaintiffs' federal antitrust claims because it precludes the vindication of Plaintiffs' statutory rights in the arbitral forum.
 
 
 94
 b. The merits
 
 1. Comcast's structural argument
 
 95
 Comcast asserts that because the damages limitation appears in a separate section of the Policies & Practices from the arbitration agreement, the damages limitation does not apply to disputes resolved in arbitration. The language of the damages limitation itself effectively nullifies this assertion. The damages limitation states that: "SUCH LIMITATION OF LIABILITY APPLIES IN ALL CIRCUMSTANCES". This remedies limitation applies any time Comcast incurs liability, including in arbitration.
 
 
 96
 Moreover, in the 2001 Policies & Practices, the damages limitation is located within the arbitration section; therefore, under the 2001 agreement, the limitation on liability clearly applied to arbitration proceedings. At the very least, the 2002/2003 arbitration agreements' damages limitation does the same. In fact, given the new location of the damages limitation outside the arbitration provision, it is a fair conclusion that Comcast intends it to apply in court as well as in arbitration proceedings, i.e., Comcast expanded the scope of the damages limitation in the 2002/2003 Policies & Practices. Additionally, it would be nonsensical for Comcast to create a mandatory alternate resolution system to resolve disputes with its subscribers, and then include a damages limitation that — under the theory Comcast offers here — would never apply because all cases would go to arbitration. In dealing with the retroactivity question, we found that the 2002/2003 arbitration agreements reflected a change in language but not a significant change in the substance of the contractual relationship between Comcast and its subscribers. Comcast's "separate section" argument is unpersuasive.
 
 2. Waiver
 
 97
 15 U.S.C. § 15(a) states in relevant part that a private antitrust plaintiff "shall recover threefold the damages by him sustained" (emphasis added). Congress's use of the word "shall" makes the treble damages remedy a mandatory result if a plaintiff successfully sues an antitrust violator. This language directly conflicts with the language of the first paragraph of the damages provision quoted above.
 
 
 98
 There is no Supreme Court precedent that speaks directly to the question of whether treble damages under federal antitrust law may be waived by contract. However, in Mitsubishi, the Court noted in dicta that if provisions in the arbitration agreement at issue had operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." 473 U.S. at 637, 105 S.Ct. 3346 n. 19. As the Mitsubishi court noted, other circuits have similarly disapproved of waivers of statutory remedies for antitrust violations. See, e.g., Gaines v. Carrollton Tobacco Bd. of Trade, Inc., 386 F.2d 757, 759 (6th Cir.1967) ("[I]t seems clear as a matter of law that such an agreement, if executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds."). On the basis of these precedents, we conclude that the award of treble damages under the federal antitrust statutes cannot be waived.
 
 
 99
 At first blush, the conflict on the award of treble damages between the arbitration agreements and the federal antitrust statutes, and the non-waivability of treble damages in the federal antitrust context, indicate that Plaintiffs should prevail on their vindication of statutory rights claim. However, the "Limitation on Liability" section of the Policies & Practices also contains a "savings clause" located immediately after the operative language, quoted earlier, that limits a plaintiff's remedies. This "savings clause"[16] states:
 
 
 100
 YOUR SOLE AND EXCLUSIVE REMEDIES UNDER THIS AGREEMENT ARE AS EXPRESSLY SET FORTH IN THIS AGREEMENT, UNLESS APPLICABLE LAW PROVIDES THAT CERTAIN REMEDIES, DAMAGES AND/OR WARRANTIES CANNOT BE WAIVED, LIMITED OR OTHERWISE MODIFIED.
 
 
 101
 The meaning of this language is straightforward. If the law does not permit waiver of a remedy, a plaintiff will still have that remedy, the Policies & Practices liability limitation notwithstanding. The savings clause, in other words, removes the conflict between the language of the arbitration agreements and the federal antitrust statutes on the issue of treble damages. Therefore, by the terms of the arbitration agreements' savings clause, the arbitrator must award treble damages for a federal antitrust violation.
 
 
 102
 As to the Kristian complaint (which raises the federal antitrust claims), the presence of a damages limitation in the 2002/2003 agreements — even though it poses a question of arbitrability — does not preclude enforcement of the arbitration agreements. Because the damages limitation does not apply to Plaintiffs' claims under federal antitrust law, the damages limitation does not prevent the Plaintiffs in Kristian from vindicating their statutory rights in arbitration. The governing law mandates that Plaintiffs can recover treble damages in arbitration for federal antitrust violations.
 
 
 103
 ii. Plaintiffs' state antitrust claims
 
 
 104
 a. The question of arbitrability
 
 
 105
 Moving to our analysis of the Rogers complaint (which raises the state antitrust claims), Massachusetts state antitrust law, while generally tracking federal antitrust law, does not use the same language. In relevant part, Mass. Gen. Laws. c. 93 § 12 states that "the court may award up to three times the amount of actual damages sustained" (emphasis added). Unlike federal antitrust law, which mandates that a victorious antitrust plaintiff will recover treble damages, Massachusetts law places the award of treble damages within a court's discretion. The use of the word "may" in Massachusetts law, as opposed to the word "shall" in federal law, means that the prohibition against treble damages in the arbitration agreements precludes the exercise of the discretion given by statute to a decision maker (be it an arbitrator or a court) in awarding treble damages. However, whether the arbitration agreements' language prohibits the actual award of treble damages (federal), or merely the possibility for that award (Massachusetts), the conflict between the arbitration agreements and state antitrust law on the issue of treble damages is plain.
 
 
 106
 On the basis of this obvious conflict, one might be tempted to conclude that, as with the federal antitrust statutes on the treble damages issue, the state antitrust statute presents a question of arbitrability. However, unlike under federal law, where the waiver of the statutory antitrust remedy is proscribed, it is unclear — or in other words, ambiguous — whether waiver of treble damages is permissible under Massachusetts law. If the answer to the waiver question under state law were clear, we would immediately conclude that there is a question of arbitrability and would proceed to decide the merits of Plaintiffs' vindication of statutory rights claim. Instead, as the Supreme Court did in PacifiCare, we must ascertain the extent of the legal ambiguity on the waiver issue in resolving the threshold question of arbitrability.
 
 
 107
 b. Waiver
 
 
 108
 The Massachusetts Supreme Judicial Court most recently discussed whether a statutory right or remedy may be waived under Massachusetts state law in Canal Electric Co. v. Westinghouse Electric Corp., 406 Mass. 369, 548 N.E.2d 182 (1990). There, the Supreme Judicial Court answered questions of law that were certified by the United States District Court for the District of Massachusetts concerning, inter alia, whether a "Limitation of Liability" provision in a sales contract barred a statutory unfair trade practice claim against a manufacturer. See id. at 183. In Canal, the plaintiffs, including Canal, were "electric utility companies that allege that they incurred substantial losses as a result of the failure of certain components of an electric generator manufactured by the defendant, Westinghouse.. . ." Id. The question was "whether Canal could validly waive its [Mass. Gen. Laws] c. 93A, § 11, claim by assenting to the Limitation of Liability clause." Id. at 187.
 
 The Supreme Judicial Court held that:
 
 109
 A statutory light or remedy may be waived when the waiver would not frustrate the public policies of the statute. For example ... we stated that a contractual waiver of statutory rights is permissible when the statute's purpose is the "protection of the property rights of individual parties ... rather than ... the protection of the general public." A statutory right may not be disclaimed if the waiver could "do violence to the public policy underlying the legislative enactment."
 
 
 110
 Id. (internal citations omitted). On the basis of this reasoning, the Supreme Judicial Court concluded that Canal could waive its claim under c. 93A.
 
 
 111
 Arguably, given that Massachusetts decided to make the award of treble damages under its antitrust law a matter of discretion, treble damages are not an indispensable element of Massachusetts' antitrust scheme, and the recovery of treble damages is therefore waivable. However, the Canal court also stated, albeit in passing, that "[a]lthough there might be certain c. 93A, § 11 claims that a business plaintiff could not waive, such as a claim sounding in antitrust, facts to establish such a claim have not been alleged or established." Id. at 187-888, 548 N.E.2d 182 (emphasis added). The Canal court also stated that "we ordinarily would not effectuate a consumer's waiver of rights under c. 93A," id. at 187. Given this additional language hinting that waiver of statutory remedies will not be allowed in situations involving a consumer plaintiff and/or antitrust claims, categories that Plaintiffs fall into, we see Massachusetts law on this question of waiver as ambiguous at best.
 
 
 112
 In the presence of this ambiguity, PacifiCare is dispositive. When there is an underlying legal ambiguity, and the parties have not explicitly expressed otherwise, Howsam's "interpretive rule" does not apply, and an arbitrator must decide the underlying legal question in the first instance so that the federal policy in favor of arbitration is not frustrated. Plaintiffs' vindication of statutory rights claim, based on the conflict between the arbitration agreements and Massachusetts antitrust law, does not raise a question of arbitrability.
 
 
 113
 In summary, as to both complaints, Plaintiffs' vindication of statutory rights claim, based on the damages limitation in the arbitration agreements, fails. As to Kristian, while there is a question of arbitrability, the damages limitation is inoperative because of the savings clause. In Rogers, there is no question of arbitrability because of the ambiguity on the waiver issue.
 
 F. Attorney's fees
 
 114
 i. The question of arbitrability
 
 
 115
 In relevant part, the 2002/2003 arbitration agreements state that:
 
 
 116
 The Company will pay for all reasonable arbitration filing fees and arbitrator's costs and expenses except that YOU ARE RESPONSIBLE FOR ALL COSTS THAT YOU INCUR IN THE ARBITRATION, INCLUDING, BUT NOT LIMITED TO, YOUR EXPERT WITNESSES OR ATTORNEYS.
 
 
 117
 The arbitration agreements' prohibition on the recovery of attorney's fees and other costs directly conflicts with statutory language in federal and Massachusetts law, both of which provide for the recovery of attorney's fees and costs in antitrust cases.[17]
 
 
 118
 In Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 82, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), a purchaser of a mobile home brought a putative class action against a lender that had financed the purchase, asserting claims under the Truth in Lending Act ("TILA"). There, the Supreme Court addressed "the question whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." Id. at 82, 121 S.Ct. 513. Randolph pre-dates the "trilogy" of Howsam, PacifiCare, and Bazzle and is not mentioned or cited in any of the three subsequent decisions. However, Randolph has never been abrogated. It is also consistent with the later decisions.
 
 The plaintiff in Randolph asserted that:
 
 119
 the arbitration agreement's silence with respect to costs and fees creates a "risk" that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum, and thereby forces her to forgo any claims she may have against petitioners. Therefore, she argues, she is unable to vindicate her statutory rights in arbitration.
 
 
 120
 Id. at 90, 121 S.Ct. 513. The Court acknowledged that typically, in analyzing whether statutory claims may be arbitrated, "we [the Court] first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Id. But instead of conducting this waiver analysis (as we did, for example, in regard to treble damages under federal and state antitrust statutes), the Court bypassed it, and concluded that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." Id. Moreover, the Court also held: (1) that where "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs," id. at 92, 121 S.Ct. 513, and (2) "the arbitration agreement's silence on the subject ... alone is plainly insufficient to render it unenforceable," i.e., a showing by the plaintiff of silence on costs does not meet the plaintiff's burden. However, the Court did not explain how detailed a plaintiff's showing must be to meet the burden. See id.
 
 
 121
 By bypassing the waiver analysis, assuming that prohibitive cost is a valid ground to challenge the enforceability of an arbitration agreement, and allocating to the plaintiff the burden of showing prohibitive arbitration costs, the Supreme Court: (1) assumes that the issue of arbitration costs raises a question of arbitrability; and (2) rules on the merits of that question of arbitrability, concluding that "Randolph [the plaintiff] did not meet [her] burden." Id. The Court's assumption that a showing of prohibitive arbitration costs is a valid challenge to enforcement of an arbitration agreement makes practical sense. If, because of a consumer agreement — for example, the Policies & Practices — a plaintiff's only apparent dispute resolution forum is binding, mandatory arbitration, and the plaintiff cannot afford to arbitrate because of an inability to recover attorney's fees and costs, the plaintiff is essentially deprived of any dispute resolution forum whatsoever.
 
 
 122
 Other circuits have similarly interpreted Randolph. For example, in Anders v. Hometown Mortgage Servs., Inc., 346 F.3d 1024 (11th Cir.2003), the Eleventh Circuit also confronted the question of whether an arbitration clause will be invalidated because it failed to provide for arbitration costs. The Eleventh Circuit found a question of arbitrability, and then looked to the Supreme Court's decision in Randolph to decide the merits. Anders, 346 F.3d at 1028-29.
 
 
 123
 Here, Plaintiffs have a much stronger position than the plaintiff in Randolph. The clause in Randolph was silent on the question of costs and fees. By contrast, the 2002/2003 arbitration agreements explicitly state that a plaintiff bears all of his or her own costs, including the cost of experts and attorneys. The conflict between the arbitration agreements and the statutes could not be clearer. More importantly, again in contrast to the plaintiff in Randolph, Plaintiffs make a strong showing that costs and attorney's fees will be prohibitively expensive. In the district court, Plaintiffs submitted extensive declarations from a former Massachusetts Superior Court justice, an attorney who specializes in antitrust law and class actions, and an economist. These declarations establish that the pursuit of Plaintiffs' antitrust claims will require a huge outlay of financial resources. Without the possibility of recovering costs and attorney's fees, an individual plaintiff would undoubtedly have an impossible time securing legal representation in either Kristian or Rogers, given the minor amount an individual plaintiff would likely recover relative to the cost of prosecution. This preliminary merits analysis, in line with PacifiCare, and Randolph's presumption that a cost-based challenge raises a question of arbitrability, leads us to conclude that Plaintiffs have raised a question of arbitrability in their challenge to the enforceability of the arbitration agreements because of the prohibition against an award of attorney's fees and costs.
 
 
 124
 ii. The merits
 
 
 125
 Comcast directly responds in two ways. First, Comcast asserts that if our decision relies primarily on the affidavits of Plaintiffs' experts submitted below, we should remand to the district court for further development of the factual record on the costs issue. We disagree. We are not required to close our eyes to the overwhelming weight of facts already in the record. The prosecution of a complex antitrust lawsuit, either in court or in arbitration, requires the outlay of substantial financial resources. The affidavits submitted to the district court by Plaintiffs detail this reality. We see no reason to ignore the obvious.
 
 
 126
 Next, Comcast argues that, contrary to the plain language of the agreements, Plaintiffs can recover attorney's fees and costs. Comcast states that the phrase "responsible for all costs" does not by itself bar an award of fees. Rather, "a plaintiff is always `responsible for all costs' until it is awarded such costs." Comcast would have us view the language barring costs as a mere statement of the truism that a party must pay its costs up front, and then can recover them after the proceedings are over. This is an implausible argument. The language of the fees and costs provision unequivocally states that while Comcast will pay arbitration filing fees, and an arbitrator's costs and expenses, "YOU [a plaintiff] ARE RESPONSIBLE FOR ALL COSTS THAT YOU INCUR IN THE ARBITRATION, INCLUDING, BUT NOT LIMITED TO, YOUR EXPERT WITNESSES OR ATTORNEYS." This language unmistakably places the burden of a plaintiff's costs and attorney's fees squarely on him or her.
 
 
 127
 As we find these responses to Plaintiff's position on attorney's fees unpersuasive, we are left to conclude that, indeed, the ban on the recovery of attorney's fees and costs in the arbitration agreements would burden Plaintiffs here with prohibitive arbitration costs, preventing Plaintiffs from vindicating their statutory rights in arbitration. Left in place, the provision of the arbitration agreements barring the recovery of attorney's fees and costs might require us to deny the motion to compel arbitration or, at least, preclude the application of the bar in arbitration.
 
 
 128
 iii. Severance
 
 
 129
 The Policies & Practices anticipates this scenario. Near the end of the 2002/2003 Policies & Practices is a section entitled "Enforceability and Survival", which states, in relevant part: "[i]f any portion of these Policies and Practices is determined to be illegal or unenforceable, then the remainder of such Policies and Practices shall be given full force and effect." In other words, in addition to the savings clause contained within the "Limitation on Liability" section, the Policies & Practices contains a general savings clause.
 
 
 130
 On the basis of this provision, Comcast takes the general position that "[n]eedless to say, any terms other than the class arbitration limitation, are severable. Subscribers fail to identify any term that is inseparable from the general requirement that Subscribers arbitrate their claims.. .." In other words, in the event that certain provisions are found illegal or unenforceable, Comcast asserts that such provisions can and should be excised, saving the unoffending provisions.
 
 
 131
 We agree with this proposition as it relates to the prohibition against an award of attorney's fees and costs. Therefore, in the end, our conclusion on Plaintiff's vindication of statutory rights claim based on the bar against attorney's fees and costs parallels our conclusion in regards to Plaintiffs' vindication of statutory rights claim based on treble damages mandated by federal antitrust law. Plaintiffs may recover attorney's fees and costs in arbitration because the savings clause severs the prohibition on attorney's fees and costs, and "saves" the remaining terms of the Policies & Practices. Thus, the arbitral forum remains viable.
 
 G. Class arbitration
 
 132
 i. The question of arbitrability
 
 
 133
 The 2002/2003 arbitration agreements clearly prohibit any type of class or consolidated action:
 
 
 134
 THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS YOUR STATE'S LAWS PROVIDE OTHERWISE.
 
 
 135
 Comcast cites Bazzle for the proposition that class actions are a procedural issue left properly for an arbitrator to decide. However, as with its interpretation of the Court's holding in PacifiCare, Comcast misreads the decision.
 
 
 136
 As explained earlier, the Court in Bazzle was "faced at the outset with a problem concerning the contracts' silence. Are the contracts in fact silent, or do they forbid class arbitration ...?" Bazzle, 539 U.S. at 447, 123 S.Ct. 2402. Since the literal terms of the agreement did not resolve the class arbitration question, the Court concluded that "the question — whether the agreement forbids class arbitration — is for the arbitrator to decide." Bazzle, 539 U.S. at 451, 123 S.Ct. 2402. However, we do not confront that situation here. Unlike the arbitration agreement in Bazzle, the 2002/2003 arbitration agreements unmistakably forbid the use of class procedures in arbitration. In other words, Pacificare's holding did not apply to Plaintiffs' attorney's fees and costs claim because of the clarity of the conflict between the arbitration provisions and the state and federal antitrust statutes. Similarly, Bazzle does not apply here because of the clarity of the prohibition against class arbitration.
 
 
 137
 We recognize that the arbitration agreements' class mechanism prohibition is not in direct conflict with the relevant antitrust statutes, state and federal, which do not mention class actions or the like. However, the arbitration agreements' language ostensibly conflicts with the Federal Rules of Civil Procedure, which provide for class actions. See Fed.R.Civ.P. 23. We say ostensibly because the Policies & Practices explicitly forbids only class arbitration, and not class actions. However, because the Policies & Practices creates a mandatory arbitration regime, a ban on class arbitration effectively forecloses the use of any class-based mechanism.
 
 
 138
 The bar has substantial implications for the enforceability of the arbitration agreements. We have said that the legitimacy of the arbitral forum rests on "the presumption that arbitration provides a fair and adequate mechanism for enforcing statutory rights." Rosenberg, 170 F.3d at 14. The Supreme Court has stated this same premise. In Mitsubishi, the Court held that "[s]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the [federal substantive] statute will continue to serve both its remedial and deterrent function." 473 U.S. at 637, 105 S.Ct. 3346. The bar on class arbitration threatens the premise that arbitration can be "a fair and adequate mechanism for enforcing statutory rights." Rosenberg, 170 F.3d at 14.
 
 
 139
 In Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Supreme Court stated that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," id. at 617, 117 S.Ct. 2231 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.1997)). In Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir.2004), the Seventh Circuit stated the proposition even more bluntly: "It would hardly be an improvement to have in lieu of this single class action 17,000,000 suits each seeking damages of $15.00 to $30.00.... The realistic alternative to a class action is not 17,000,000 individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.00." While Comcast is correct when it categorizes the class action (and class arbitration) as a procedure for redressing claims — and not a substantive or statutory right in and of itself — we cannot ignore the substantive implications of this procedural mechanism.
 
 
 140
 Here, the putative class would consist of Comcast's Boston area subscribers. According to the factual information contained in the unopposed expert declarations Plaintiffs submitted to the district court below, each putative class member's estimated recovery — assuming the damage award was trebled pursuant to the applicable antitrust statute — would range from a few hundred dollars to perhaps a few thousand dollars. By contrast, the expert fees alone are estimated to be in the hundreds of thousands of dollars; and attorney's fees could reach into the millions of dollars. To say that each potential class member is unlikely to have or make available the up-front costs needed to prosecute this costly antitrust suit is a large understatement. The class mechanism ban — "particularly its implicit ban on spreading across multiple plaintiffs the costs of experts, depositions, neutrals' fees, and other disbursements"—forces the putative class member "to assume financial burdens so prohibitive as to deter the bringing of claims .... And these costs ... will exceed the value of the recovery she is seeking." Myriam Gilles, Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action, 104 Mich. L.Rev. 373, 407 (2005).
 
 In Randolph, the plaintiff asserted that:
 
 141
 the arbitration agreement's silence with respect to costs and fees creates a "risk" that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum, and thereby forces her to forgo any claims she may have against petitioners. Therefore, she argues, she is unable to vindicate her statutory rights in arbitration.
 
 
 142
 531 U.S. at 90, 121 S.Ct. 513. In response, the Supreme Court acknowledged that "the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." Id. Here, there is no doubt about these large arbitration costs.
 
 
 143
 Although neither the Supreme Court nor the First Circuit has decided a case that presents the exact issue we face here, other courts of appeals have. These courts concluded that there was a question of arbitrability presented by the bar on class arbitration. See, e.g., Jenkins v. First Am. Cash Advance of Georgia, 400 F.3d 868 (11th Cir.2005);[18] Livingston v. Associates Fin., Inc., 339 F.3d 553 (7th Cir.2003). We see no reason not to do the same here. The class arbitration bar is unmistakable. Because the denial of class arbitration in the pursuit of antitrust claims has the potential to prevent Plaintiffs from vindicating their statutory rights, Plaintiffs present a question of arbitrability with respect to the 2002/2003 arbitration agreements' class arbitration prohibition.
 
 
 144
 ii. The merits
 
 
 145
 a. Relevant federal law
 
 
 146
 On the merits, the decisions of other courts of appeal appear to weigh against Plaintiffs, although not overwhelmingly so. Four of our sister circuits — the Third, Fourth, Seventh, and Eleventh — enforce consumer arbitration clauses barring the use of class mechanisms (class action and/or class arbitration). See Johnson v. West Suburban Bank, 225 F.3d 366, 374 (3d Cir.2000) ("Because there is no irreconcilable conflict between arbitration and the goals of the TILA [Truth in Lending Act], we similarly hold that claims arising under the EFTA [Electronic Fund Transfer Act] may also be subject to arbitration notwithstanding the desire of a plaintiff who previously consented to arbitration to bring his or her claims as part of a class."); Snowden v. CheckPoint Check Cashing, 290 F.3d 631, 638 (4th Cir.2002) ("We also reject [the plaintiff's] argument that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages."); Livingston, 339 F.3d at 559 ("[H]aving found the Arbitration Agreement enforceable we must give full force to its terms.... The Arbitration Agreement at issue here explicitly precludes ... class claims or pursuing `class action arbitration'"); Randolph II, 244 F.3d at 819 ("[W]e hold that a contractual provision to arbitrate TILA claims is enforceable even if it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA.").
 
 
 147
 These four decisions have two important commonalities. First, attorney's fees and costs were either recoverable by the plaintiffs who contested the arbitral forum on the basis of the class arbitration ban, or the fees and costs issue was moot. For example, in Johnson, the court stated "[n]or will arbitration necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors. Attorneys' fees are recoverable under the TILA." Johnson, 225 F.3d at 374. In Livingston, the defendant agreed to pay all costs associated with arbitration. Livingston, 339 F.3d at 557. Here, too, because of the general savings clause in the Policies & Practices, we have ruled that attorney's fees and costs must be available in the arbitral forum.
 
 
 148
 Second, in all four decisions, the plaintiffs raised claims against banks or other financial lenders primarily under the TILA.[19] This is not the case here, where we are dealing with federal and state antitrust claims. That is a potentially important distinction. Therefore, we must examine the rationale for these decisions more closely. For this purpose, we will discuss the Third Circuit's Johnson decision. Each of the other circuits relies on Johnson. See Snowden, 290 F.3d at 638-39 (citing Johnson, 225 F.3d at 374); Livingston, 339 F.3d at 559 (citing Johnson, 225 F.3d at 369); Randolph II, 244 F.3d at 818 ("Our thinking in this respect is consistent with the Third Circuit's decision that `[arbitration] clauses are effective even though they may render class actions to pursue statutory claims under the TILA... unavailable.'") (quoting Johnson, 225 F.3d at 369). In supporting the bar on class arbitration, Johnson also contains the most extensive analysis for that position. See generally Johnson, 225 F.3d at 370-77.
 
 
 149
 b. The Johnson decision
 
 
 150
 The Johnson decision begins its analysis of the validity of a class mechanism bar with the Supreme Court's decision in Gilmer. In Gilmer, the plaintiff brought an age discrimination claim, and then contested arbitration of that claim because, inter alia, the arbitral forum did not offer all of the procedures a judicial forum would, such as full discovery and class actions. See Gilmer, 500 U.S. at 29-33, 111 S.Ct. 1647. Gilmer's holding — that an ADEA plaintiff can be compelled to arbitrate his ADEA claim — is based on the proposition from Mitsubishi that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Gilmer, 500 U.S. at 28, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 637, 105 S.Ct. 3346)(internal quotation marks omitted).
 
 
 151
 Johnson extends Gilmer to the TILA context and enforces a class action bar in arbitration, based on three assertions. First, class actions do not necessarily give plaintiffs better incentives to bring private enforcement actions:
 
 
 152
 [t]he sums available in recovery to individual plaintiffs are not automatically increased by use of the class forum. Indeed, individual plaintiff recoveries available in a class action may be lower than those possible in individual suits because the recovery available under TILA's statutory cap on class recoveries is spread over the entire class.
 
 
 153
 Johnson, 225 F.3d at 374.
 
 
 154
 Second, plaintiffs will still be able to find representation without the class action mechanism because of the availability of attorney's fees and costs:
 
 
 155
 Nor will arbitration necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors. Attorneys' fees are recoverable under the TILA, see 15 U.S.C. § 1640(a)(3), and would therefore appear to be recoverable in arbitration, as arbitrators possess the power to fashion the same relief as courts.
 
 
 156
 Johnson, 225 F.3d at 374-75 (internal citations omitted). According to the Johnson court, "though pursuing individual claims in arbitration may well be less attractive than pursuing a class action in the courts, we do not agree that compelling arbitration of the claim of a prospective class action plaintiff irreconcilably conflicts with TILA's goal of encouraging private actions to deter violations of the Act." Id.
 
 
 157
 Third, Johnson asserts that even if TILA plaintiffs are discouraged from bringing private enforcement actions, administrative enforcement exists to fill the void. "Our conclusion that there is no irreconcilable conflict between the TILA's social policy goals and arbitration of claims that could have been heard as part of a class action is bolstered by the statute's administrative enforcement provisions. These provisions offer meaningful deterrents to violators of the TILA if private enforcement actions should fail to fulfill that role." Id. at 375.
 
 
 158
 In our view, these rationales drawn from the TILA context do not support the validity of a bar to class arbitration of Plaintiffs' antitrust claims.
 
 
 159
 c. The inapplicability of Johnson to the antitrust context
 
 
 160
 As an initial matter, prosecuting a typical TILA claim is vastly different from prosecuting an antitrust claim because of the sheer complexity of the latter. For example, in Snowden, the plaintiff engaged in "deferred deposit" transactions, where "a customer tenders a check to the store that is cashed for a service fee with the understanding that the check will not be negotiated until some later, agreed upon time." 290 F.3d at 633. The plaintiff alleged in her complaint that: (1) the "deferred deposit transactions with [the defendant] were loans; and (2) that the service fee charged by [the defendant] for such transactions constituted interest." Id. at 635. As a result, the plaintiff asserted that the defendant had violated, inter alia, the TILA.
 
 
 161
 In a cases such as Snowden, there is a specific transaction at issue. Whether there is a TILA violation usually hinges on whether the facts about that transaction do or do not establish a violation of the TILA. This is not a particularly difficult analysis. As one commentator has summarized, in TILA cases, "one must be cognizant of the type of credit being extended as well as the terms of the credit contract to determine which disclosures, in addition to the APR and finance charge, are required under TILA and any other applicable Federal and state laws." Matthew A. Edwards, Empirical and Behavioral Critiques of Mandatory Disclosure: Socioeconomics and the Quest for Truth in Lending, 14 Cornell J.L. & Pub. Pol'y 199, 216 (2005). By contrast, whether a company's action constitutes an antitrust violation is usually a complicated question of fact. The law that then applies to those facts is equally complex. This complexity of prosecuting an antitrust claim is confirmed by the unopposed experts' affidavits provided by Plaintiffs, which describe the great expense and labor required by such a case.
 
 
 162
 Three of Plaintiffs' experts — Howard J. Sedran, an attorney with twenty-six (26) years of experience litigating class actions including antitrust actions; J. Owen Todd, a former justice of the Massachusetts Superior Court; and John C. Beyer, an economist — agree that to prosecute their antitrust claims successfully, Plaintiffs will have to undertake an elaborate factual inquiry that includes:
 
 
 163
 defining the relevant product market, defining the relevant geographic market, establishing the market power of defendants and the manner in which they exercised such power; the effects of potential competition within the relevant markets; the impact of conduct on any non-incumbent cable providers in the relevant market; analyzing the "swapping" agreements alleged in the Complaint, as well as merger and purchase of asset transactions that defendants may have been involved in relating to the alleged monopolization conduct; reviewing and analyzing the increases in cable subscription rates over time; establishing Comcast's alleged monopoly overcharges in relevant markets; and further calculating the named plaintiffs' damages.
 
 
 164
 Beyer estimates that expert witness fees alone will cost a minimum of $300,000, which could exceed in excess of $600,000 depending on the implementation of the factual inquiry. Beyer avers that "[d]irect costs (travel, communications, computer analysis, etc.) would be an additional expense, which generally is 12-15 percent of professional service costs." Sedran avers that "based on my experience in complex antitrust cases, it is reasonable to expect that competent attorneys would be required to expend several million dollars of attorneys' time and hundreds of thousands of dollars in expenses, including expert witness fees." Additionally, as stated earlier, according to Plaintiffs' expert affidavits, an individual recovery here will range from a few hundred dollars to a few thousand dollars at most.
 
 
 165
 The complexity of an antitrust case generally, and the complexity and cost required to prosecute a case against Comcast specifically, undermine the Johnson court's rationales for supporting a bar to class arbitration. Johnson first asserts that a class action does not necessarily provide greater incentives for private enforcement actions in the TILA context. Yet, Plaintiffs have provided uncontested and unopposed expert affidavits demonstrating that without some form of class mechanism — be it class action or class arbitration — a consumer antitrust plaintiff will not sue at all. For example, Todd avers that "[d]ue to the small value of the individual consumer/subscriber's claim, retaining expert witnesses is completely unrealistic and impractical on an individual claim basis. Furthermore, due to the complexity of antitrust cases, including a case of this kind, the individual consumer/subscriber's cases would be extremely compromised, and effectively precluded, without the testimony of expert witnesses."
 
 
 166
 Johnson's second assertion — that the availability of attorney's fees provides the necessary incentive for private enforcement actions — similarly finds little to no purchase in the antitrust context. A plaintiff's attorney in the consumer antitrust context would be required to invest a large initial outlay in time and money, including "opportunity costs"[20] — estimated in the hundreds of thousands of dollars — for only a portion of an individual plaintiff's recovery, which at most is a few thousand dollars. Then, factoring in the uncertainty of success, the appeal for an attorney to take on an individual plaintiff's antitrust claim shrinks even further. As two commentators have noted:
 
 
 167
 [t]he court decisions striking class action prohibitions have all emphasized that many small-dollar claims are simply not feasible if brought individually. In essence, these cases recognize ... that by increasing plaintiffs' transaction costs, defendants can induce them to accept lower settlements or even drop their claims altogether. Citing the Supreme Court's oft-stated justification for supporting class actions, courts invalidating class action prohibitions explain that it is often not rational for individual consumers or attorneys to bring small claims, whether through litigation or arbitration.
 
 
 168
 Jean B. Sternlight & Elizabeth J. Jensen, Using Arbitration to Eliminate Consumer Class Actions: Efficient Business Practice or Unconscionable Abuse?, 67-SPG Law & Contemp. Probs. 75, 85-86 (2004). In his affidavit, Sedran succinctly puts it this way: "[i]t should not surprise anyone that a qualified attorney would not pursue a few individual cases on a contingent basis where even a victory would result in the loss of millions of dollars of time and expense."[21]
 
 
 169
 If, as a practical matter, there will be no inventive for private enforcement of antitrust claims by consumers, the Johnson court's third assertion — that any decrease in private enforcement actions will be redressed by administrative enforcement — becomes even more suspect. When Congress enacts a statute that provides for both private and administrative enforcement actions, Congress envisions a role for both types of enforcement. Otherwise, Congress would not have provided for both. Weakening one of those enforcement mechanisms seems inconsistent with the Congressional scheme. Eliminating one of them entirely is surely incompatible with Congress's choice.
 
 
 170
 In summary, we find Johnson's rationale for allowing arbitration to move forward in the TILA context despite a bar on the use of class mechanisms unpersuasive when applied to Plaintiffs' antitrust claims. Because of the presence of the bar on class mechanisms in arbitration, Plaintiffs cannot be compelled to arbitrate their antitrust claims, both state and federal, if that bar remains in place.
 
 
 171
 d. The position of other courts
 
 
 172
 There is support for this conclusion in the holdings of other courts. Although these courts — be they state courts or federal courts applying state law — have generally refused to compel arbitration on state unconscionability grounds, these decisions contain reasoning that mirrors our own.[22] These decisions emphasize that a class mechanism bar can impermissibly frustrate the prosecution of claims in any forum, arbitral or judicial. As the California Supreme Court has observed, "class actions and arbitrations are, particularly in the consumer context, often inextricably linked to the vindication of substantive rights." Discover Bank v. Superior Court, 36 Cal.4th 148, 161, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (Cal.2005).
 
 
 173
 In Ting v. AT&T, 319 F.3d 1126, 1130 (2003), the Ninth Circuit confronted an arbitration agreement in a consumer service agreement that "barr[ed] customers from, among other things, pursuing claims against AT & T on a classwide basis." Deciding the case on the basis of California state unconscionability doctrine, the Ninth Circuit upheld "the district court's conclusion that the class-action ban violates California's unconscionability law" on the basis of this persuasive reasoning:
 
 
 174
 [i]t would not have been economically feasible to pursue the claims in these cases on an individual basis, whether the case was brought in court or in arbitration. If the Legal Remedies Provisions contained in AT & T's new CSA had governed customers' rights in these situations, it is highly unlikely any of the claims would have been prosecuted. It is undisputed that the lawyers who represented the plaintiffs in these cases would not have taken them if the only claim they could have pursued was the claim of the individual plaintiff. The reasons for this are not hard to see. The actual damages sought by the named plaintiffs are relatively insubstantial.... Consequently, it would not make economic sense for an attorney to agree to represent any of the plaintiffs in these cases in exchange for 33 1/3 % or even a greater percentage of the individual's recovery. The lawyer would almost certainly incur more in costs and time charges just getting the complaint prepared, filed and served than she would recover, even if the case were ultimately successful. Simply put, the potential reward would be insufficient to motivate private counsel to assume the risks of prosecuting the case just for an individual on a contingency basis. While retaining counsel on an hourly basis is possible, in view of the small amounts involved, it would not make economic sense for an individual to retain an attorney to handle one of these cases on an hourly basis and it is hard to see how any lawyer could advise a client to do so. The net result is that cases such as the ones listed above will not be prosecuted even if meritorious. Thus, the prohibition on class action litigation functions as an effective deterrent to litigating many types of claims involving rates, services or billing practices and, ultimately, would serve to shield AT & T from liability even in cases where it has violated the law.
 
 
 175
 Ting v. AT & T, 182 F.Supp.2d 902, 918 (N.D.Cal.2002).
 
 
 176
 The parallels between the effect of the class action ban in Ting and the class mechanism bar in the Policies & Practices is impossible to ignore. If the class mechanism prohibition here is enforced, Comcast will be essentially shielded from private consumer antitrust enforcement liability, even in cases where it has violated the law. Plaintiffs' will be unable to vindicate their statutory rights. Finally, the social goals of federal and state antitrust laws will be frustrated because of the "enforcement gap" created by the de facto liability shield.[23]
 
 
 177
 e. Severance
 
 
 178
 In its appellate reply brief, Comcast states: "[n]eedless to say, any terms other than the class arbitration limitation, are severable." Comcast reiterated this position at oral argument, stating:
 
 
 179
 With respect to the class action bar, the company has taken and it is our position that it is not severable from arbitration. In other words if it goes to arbitration, it goes with the bar. If the court were to find that the class action bar would have to be severed from the clause in order to make it enforceable, we would say that the whole arbitration clause would go down, and none of it would be enforceable.
 
 
 180
 However, this position is in stark contrast to the plain language of the arbitration agreements. In addition to the general savings clause, which we applied to sever the provision preventing the recovery of attorney's fees and costs, the class arbitration bar — much like the remedies limitation provision — contains its own savings clause. That provision states: "THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS ... UNLESS YOUR STATE'S LAWS PROVIDE OTHERWISE" (emphasis added). This savings clause was explicitly added to the 2002/2003 version; the 2001 iteration contains no savings clause specific to the class arbitration bar. Comcast never acknowledged this additional language in its briefing on appeal or at oral argument.
 
 
 181
 Contrary to Comcast's position on appeal, the language of the 2002/2003 Policies & Practices anticipates the possible severance of the class arbitration bar. Although the savings clause refers to a conflict between the class arbitration bar and state law — and we have found an impermissible conflict between the class arbitration bar and federal law — the basis for the conflict is irrelevant to the severance analysis. What matters for that analysis is an unmistakable expression in the savings clause that the class arbitration bar is not an indispensable condition of the arbitral forum. This disparity between the language of the arbitration agreements and Comcast's position on appeal raises an unusual quandary: do we disregard the plain language of the Policies & Practices in favor of Comcast's ex post disavowal?
 
 
 182
 We answer this question in the negative. Apparently, Comcast has simply changed its mind about the severability of the class arbitration bar. We are unaware of any principle of contract law that permits disregard of a contract provision on the basis of second thoughts by a contracting party. Moreover, as the district court correctly noted, we are dealing with a contract of adhesion, which is usually construed against the drafting party.[24] It would be particularly incongruous to allow Comcast to disavow the plain language of the contract in such a circumstance.
 
 
 183
 In the context of our retroactivity analysis, we noted that the tenet of contra proferentem does not apply in situations where the scope of an arbitration agreement is at issue. See also Paul Revere, 226 F.3d at 25. In those instances, the federal policy in favor of arbitration trumps the tenet allowing courts to construe ambiguity in an agreement strictly against the drafter. But the application of the class arbitration bar's savings clause does not raise a question about the scope of the arbitration agreement. Indeed, by applying the savings clause and severing the class arbitration bar, we are actually saving the arbitral forum-an outcome consistent with the federal policy favoring arbitration.
 
 
 184
 We acknowledge that by severing the class arbitration bar from the arbitration agreements, as applied to Plaintiffs' antitrust claims, we are excising a major provision of the arbitration agreements. The class arbitration bar comprises the second full paragraph of the section in the Policies & Practices describing the terms of the mandatory, binding arbitration regime. It establishes an arbitration regime that handles individual claims only. Typically, courts prefer declaring an arbitration agreement unenforceable rather than using severance as a remedy when fundamental elements of the arbitration regime are at issue. See Booker v. Robert Half Intern., Inc., 413 F.3d 77, 84-85 (D.C.Cir. 2005) ("A critical consideration in assessing severability is giving effect to the intent of the contracting parties.... If illegality pervades the arbitration agreement such that only a disintegrated fragment would remain after hacking away the unenforceable parts ... the judicial effort begins to look more like rewriting the contract than fulfilling the intent of the parties."). Since the premise of arbitration is the contractual agreement of the parties to the arbitral forum, drastic rewriting is particularly inappropriate. See MCI Telecomms. Corp. v. Exalon Indus., Inc., 138 F.3d 426, 428-29 (1st Cir.1998) ("[T]here is no general legal duty to arbitrate private commercial disputes; instead, such proceedings are strictly the product of voluntary contractual obligations."). In the absence of a savings clause specifically affixed to the class arbitration bar, severing that bar would be difficult to justify.
 
 
 185
 However, here, the arbitration agreements do anticipate specifically the severance of the class arbitration bar. Therefore, Comcast cannot claim that it did not foresee the possibility that, despite its strong preference for individual arbitration, it would have to arbitrate on a class basis because the contractual bar on class arbitration might, in its application to particular claims, run afoul of controlling law. This is precisely what has happened here.[25]
 
 H. State unconscionability
 
 186
 Before the district court, Plaintiffs also challenged the enforceability of the arbitration agreements on the basis of Massachusetts unconscionability law. We have focused on a vindication of statutory rights analysis, which draws on the federal substantive law of arbitrability. The relationship between the two approaches merits comment. See also supra n. 22.
 
 
 187
 Section 2 of the Federal Arbitration Act ("FAA") provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), the Supreme Court reiterated that because of this language, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Id. at 687, 116 S.Ct. 1652. As a result, when deciding whether certain claims can go forward in arbitration, federal courts have invalidated or refused to enforce arbitration agreements on the basis of these state contract law doctrines.
 
 
 188
 In effect, these state contract law doctrines, by operation of the FAA, become part of the federal substantive law of arbitrability. As stated by the Supreme Court in Moses H. Cone: "The effect of [§ 2 of the FAA] is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." 460 U.S. at 24, 103 S.Ct. 927 (emphasis added). When it comes to the arbitrability of a particular dispute, "[f]ederal law in the terms of the Arbitration Act governs that issue in either state or federal court." Id. Although Plaintiffs' challenges to the enforceability of the arbitration agreements could be evaluated through the prism of state unconscionability law, we have chosen to apply a vindication of statutory rights analysis, which is also part of the body of federal substantive law of arbitration, to the question of whether Plaintiffs' federal and state antitrust claims are arbitrable under the Policies & Practices. See Booker v. Robert Half Int'l, Inc., 413 F.3d 77 (D.C.Cir.2005) (applying vindication of statutory rights analysis to claims of race discrimination and wrongful constructive discharge under District of Columbia law); Popovich v. McDonald's Corp., 189 F.Supp.2d 772 (N.D.Ill.2002) (applying vindication of statutory rights analysis to, inter alia, claims of breach of contract and consumer fraud).
 
 
 189
 As a practical matter, there are striking similarities between the vindication of statutory rights analysis and the unconscionability analysis. In fact, many of Plaintiffs' unconscionability arguments are merely reiterations of their vindication of statutory rights arguments. For example, as to the unconscionability of the class mechanism bar, Plaintiffs state that "the class action ban is oppressive to Plaintiffs because it prevents them from vindicating their statutory rights."
 
 
 190
 Moreover, any unconscionability analysis under Massachusetts law would have to include the severance provisions that have featured so prominently in our vindication of statutory rights analysis. Those severance provisions, viewed through the lens of unconscionability, would save the arbitral forum, just as they have in our vindication of statutory rights analysis. With new ground rules, arbitration could proceed. Thus, we see no need to conduct a separate unconscionability analysis under Massachusetts law.
 
 VI.
 
 191
 We summarize our major conclusions. Contrary to the finding of the district court, we concluded that the arbitration provisions at issue applied retroactively to Plaintiffs' antitrust claims. As a result, we evaluated other arguments that Plaintiffs had raised below in opposition to arbitration.
 
 
 192
 We concluded that Comcast provided adequate notice for the arbitration agreements at issue here. Plaintiffs' vindication of statutory rights claims — each challenging arbitration of their antitrust claims by challenging the validity of a particular provision of the arbitration agreements — required a two-part analysis. First, using principles culled predominantly from the Supreme Court's trilogy of arbitration decisions — Howsam, PacifiCare, and Bazzle — we determined whether each of Plaintiffs' vindication of statutory rights arguments required the application of Howsam's "interpretive rule" — that a court rather than an arbitrator should decide whether the parties have submitted a particular dispute to arbitration, i.e., whether a question of arbitrability was presented. Second, if we found that a particular vindication of statutory rights argument presented a question of arbitrability, we proceeded to decide its "merits", i.e., whether the provision challenged by Plaintiffs required a finding that the Policies & Practices' arbitration agreement was unenforceable with respect to Plaintiffs' antitrust claims.
 
 
 193
 Using this framework, we determined that Plaintiffs' challenges to the arbitration agreements' discovery, statute of limitations, and treble damages limitation, as applied to Plaintiffs' state antitrust claims, did not present questions of arbitrability. We determined that Plaintiffs' challenges to the Policies & Practices's limitation of treble damages as applied to Plaintiffs' federal antitrust claims, its limitation on the recovery of attorney's fees and costs, and the class arbitration bar did pose questions of arbitrability. On the merits, we concluded that these provisions, if applied in the arbitral forum, would prevent the vindication of statutory rights. However, we then applied the savings clauses of the arbitration agreements to sever these provisions from the arbitration agreements as applied to Plaintiffs' antitrust claims. With these provisions removed, arbitration of the antitrust claims can proceed.
 
 
 194
 Whether the shortened limitations period contained in the Policies & Practices applies in lieu of the four-year statutory limitations period found in state and federal antitrust law, and whether Plaintiffs can recover state treble damages, are questions an arbitrator must resolve in the first instance. However, Plaintiffs will be able to recover federal treble damages and attorney's fees and costs in the arbitral forum. Additionally, arbitration must proceed on a class or consolidated basis.
 
 
 195
 For the reasons stated, the district court's holding that the arbitration clause in the 2002/2003 Policies & Practices, in its entirety, does not apply to Plaintiffs' antitrust claims is reversed. We remand for further proceedings not inconsistent with this opinion. The parties shall bear their own costs.
 
 
 196
 
 So ordered.
 
 
 
 
 Notes:
 
 
 *
 Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Swapping agreements allegedly violate antitrust laws because, by using them, cable providers can divide and allocate markets so that a cable subscriber can only obtain cable service from a single provider in his or her location. Simply put, through swapping agreements, companies trade territory, eliminating competition in a given geographical area
 
 
 [2]
 Contracts of adhesion are contracts formed with the use of standard form documents. The party that prepared the contracts typically approaches the potential contractual relationship with a take-it-or-leave-it postureSee Todd D. Rakoff, Contracts of Adhesion: An Essay in Reconstruction, 96 Harv. L.Rev. 1173, 1177 (1983). Other characteristics include: (1) the document whose legal validity is at issue is a printed form that contains many terms and clearly purports to be a contract; (2) the form has been drafted by, or on behalf of, one party to the transaction; (3) the drafting party participates in numerous transactions of the type represented by the form and enters into these transactions as a matter of routine; (4) the form is presented to the adhering party with the representation that, except perhaps for a few identified items, the drafting party will enter into the transaction only on the terms contained in the document (this representation may be explicit or may be implicit in the situation, but it is understood by the adherent); and (5)the adhering party enters into few transactions of the type represented by the form-few, at least, in comparison with the drafting party. See id.; see also Chase Commercial Corp. v. Owen, 32 Mass. App.Ct. 248, 253, 588 N.E.2d 705 (Mass.App. Ct. 1992).
 
 
 [3]
 The limitations provision highlighted by the district court states: "YOU MUST CONTACT U.S. WITHIN ONE (1) YEAR OF THE DATE OF THE OCCURRENCE OF THE EVENT OR FACTS GIVING RISE TO A DISPUTE . . . OR YOU WAIVE THE RIGHT TO PURSUE A CLAIM BASED UPON SUCH EVENT, FACTS OR DISPUTE."
 
 
 [4]
 This statement, that none of the prior agreements between Comcast and its subscribers contains a limitations provision, is incorrect. The 2001 Policies & Practices contained a limitations provision identical to the one found in the 2002/2003 versions. This fact will become important later in the analysis
 
 
 [5]
 The Policies & Practices states: "`Service(s)' means the cable TV programming and any other cable service we provide to you, and cable Internet access."
 
 
 [6]
 The 2001 Policies & Practices states in relevant part: "You agree that if you do not contact us within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute . . . you waive the right to pursue, in any forum, including arbitration or courts, a claim based upon such event, facts or dispute." The 2002/2003 version states in relevant part: "YOU MUST CONTACT U.S. WITHIN ONE (1) YEAR OF THE DATE OF THE OCCURRENCE OF THE EVENT OR FACTS GIVING RISE TO A DISPUTE . . . OR YOU WAIVE THE RIGHT TO PURSUE A CLAIM BASED UPON SUCH EVENT, FACTS OR DISPUTE." The language is nearly identical
 
 
 [7]
 This result makes sense because, once the dispute is in arbitration, the tenet ofcontra proferentem can still be applied by the arbitrator on non-scope issues.
 
 
 [8]
 47 C.F.R. § 76.1603(b) states: "[c]ustomers will be notified of any changes in rates, programming services or channel positions as soon as possible in writing." Notice must be given to subscribers a minimum of thirty (30) days in advance of such changes if the change is within the control of the cable operator. In addition, the cable operator shall notify subscribers 30 days in advance of any significant changes in the other information required by § 76.1602. The "other information required by § 76.1602" includes "[p]rices and options for programming services and conditions of subscription to programming and other services." 47 C.F.R. § 76.1602(b)(2)
 
 
 [9]
 Additionally, given the fact that the 2002 and 2003 Policies & Practices are identical, and given the fact that Plaintiffs did not file suit until December 2003, there is at least some doubt that the notice requirements of the statute, regulations, and subscriber agreements are even implicated
 
 
 [10]
 It is true that the district court concluded that the Policies & Practices is a contract of adhesion. However, under Massachusetts law, contracts of adhesion — like the Policies & Practices — are generally enforceable absent a separate finding that such contracts are "unconscionable, offend public policy, or are shown to be unfair in the particular circumstances."Owen, 32 Mass.App.Ct. at 253, 588 N.E.2d 705. The Policies & Practices is not invalid simply because it is a contract of adhesion.
 
 
 [11]
 Because we find that the 2002/2003 agreements apply retroactively, we do not reach Comcast's on-going injury argument in that context
 
 
 [12]
 15 U.S.C. § 15(a) states in relevant part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained...."
 
 
 [13]
 Massachusetts General Laws, ch.93, § 12 states in relevant part: "If the court finds that the violation was engaged in with malicious intent to injure said person, the court may award up to three times the amount of actual damages sustained, together with the costs of suit...."
 
 
 [14]
 Our statement fromMCI is dicta because the argument that the panel was discussing had been waived on appeal. However, the panel decided to discuss the ramifications of this argument anyway.
 
 
 [15]
 It may seem odd to include in our "threshold" analysis (determining who the proper decision maker will be—a court or an arbitrator) some merits analysis (determining whether the conflict between the arbitration agreements and the statutory provision invalidates the arbitral forum for the underlying antitrust claim). However, in this particular context, the enforceability of the arbitration agreement turns on the question of waiver — can a contracting party waive its right to the treble damages provided by the antitrust statute. If the answer to that question were uncertain, or, to use the language ofPacifiCare, ambiguous, the conflict between the arbitration agreement and the statute would not pose a question of arbitrability. To decide whether a court or an arbitrator should decide the merits, we must see whether resolution of the merits question, i.e., the legal consequences of the conflict between the arbitration agreement and the statutory provision, are obvious.
 This is the lesson of PacifiCare, where the Supreme Court conducted the kind of preliminary merits investigation that we are conducting here. There, confronted by a conflict between the language of the RICO statute, which authorized the award of treble damages, and an arbitration provision, which prohibited the award of punitive damages, see 538 U.S. at 403, 123 S.Ct. 1531, the Supreme Court examined whether and under what circumstances treble damages and punitive damages were equivalent. See id. at 405-06, 123 S.Ct. 1531; see also, supra n. 10. Because the legal consequences of the conflict between the arbitration provision and the RICO statute were not clear, the Supreme Court concluded its threshold analysis by sending the decision to the arbitrator to make the merits determination in the first instance. This choice serves the purpose of advancing the liberal federal policy favoring arbitration agreements. See Howsam, 537 U.S. at 83, 123 S.Ct. 588 ("[T]he Court has also long recognized and enforced a liberal federal policy favoring arbitration agreements." (internal citations and quotation marks omitted)).
 There are precedents for this preliminary assessment of the merits from other contexts. When deciding whether to grant a preliminary injunction, district courts must assess the probability of success on the merits of the party requesting the preliminary injunction. In such a situation, the district court does not actually decide the merits. What we are required to do here is akin to a preliminary injunction analysis. As we shall see, that preliminary assessment and its final outcome are not necessarily the same.
 
 
 [16]
 A "savings clause" preemptively resolves conflicts between contract language and applicable law in order to preserve the remaining, non-conflicting contract language. "Savings clause" is somewhat of a misnomer. The contractual language in conflict with applicable law is not saved. The non-conflicting language is saved. In the absence of a savings clause, the decision maker, be it an arbitrator or a court, decides the remedy for resolving a conflict between contract language and applicable law. That remedy, driven by an assessment of the intent of the parties, could be as small as severance of the offending contract language, or it could extend to outright non-enforcement of portions of the contract that include the offending contract language or the contract in its entirety. In essence, a savings clause serves as an expression of the intent of the parties that limits the remedies an arbitrator or court may use in situations of conflict between contract terms and applicable law. The savings clause at issue here, contained in the "Limitation on Liability" section of the Policies & Practices, emphasizes the use of severance as a remedy
 
 
 [17]
 15 U.S.C. § 15(a) states in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover. . . the cost of suit, including a reasonable attorney's fee." Mass. Gen. Laws. c. 93 § 12 states in relevant part that "[i]f the court finds that the violation was engaged in with malicious intent to injure said person, the court may award up to three times the amount of actual damages sustained, together with the costs of suit, including reasonable attorneys fees."
 While there is still the "shall" versus "may" distinction between the federal and state antitrust statutes, we find that this distinction does not require a separate analysis as to attorney's fees and costs along federal versus state lines. The "may" in the state statute does not apply to the award of costs and attorney's fees. The clause containing "may" is separated from the "costs of suit" clause by a comma. While a state court may award up to three times the amount of actual damages, the costs of suit, including attorney's fees, are mandatorily awarded.
 
 
 [18]
 InJenkins, the Eleventh Circuit decided a similar case using an unconscionability rationale. However, the court relied on another of its decisions, which used a "vindication of statutory rights" rationale. The Jenkins court equated the two rationales. See Jenkins, 400 F.3d at 877-78; see also Randolph v. Green Tree Fin. Corp.-Alabama, 244 F.3d 814, 819 (11th Cir.2001)(hereinafter Randolph II).
 
 
 [19]
 The Eleventh Circuit's decision inJenkins — also a suit against a financial lender — extended the circuit's holding in Randolph II enforcing a class mechanism bar in an arbitration agreement to a plaintiff's claims under Georgia usury law. See Jenkins, 400 F.3d at 870, 877-78. While Jenkins is the more recent decision, Randolph II established the rule in favor of enforcing class mechanism bars in arbitration agreements for the Eleventh Circuit. Therefore, we will use Randolph II for purposes of our analysis.
 
 
 [20]
 "Opportunity costs" are the value of work an attorney foregoes in order to prosecute a particular plaintiff's claim
 
 
 [21]
 We recognize that the antitrust statutes provide for an award of attorney's fees to a prevailing plaintiff. Hence, arguably, an attorney could rely on that statutory award instead of a contingent fee agreement to recoup the investment of attorney time. However, this would be, at best, a dubious investment for any rational attorney. Antitrust cases by their nature are difficult and uncertain. In any individual case, the disproportion between the damages awarded to an individual consumer antitrust plaintiff and the attorney's fees incurred to prevail on the claim would be so enormous that it is highly unlikely that an attorney could ever begin to justify being made whole by the court. (For example, using the figures of Plaintiffs' expert witnesses, the recovery for an individual plaintiff in this case would, at most, be in the thousands of dollars whereas attorney time could escalate into the millions of dollars.) Moreover, being made whole is hardly a sufficient incentive for an attorney to invest in a case such as this when time spent on more predictable cases would be advantageous, and frankly, rational
 
 
 [22]
 We realize that a state unconscionability analysis, based on the particulars of state contract law, may include considerations not present in the vindication of statutory rights analysis applied here, which is not dependent on state law. However, the unconscionability analysis always includes an element that is the essence of the vindication of statutory rights analysis — the frustration of the right to pursue claims granted by statute. For example, inFaber v. Menard, Inc., 367 F.3d 1048 (8th Cir.2004), the Eighth Circuit held that "[a] fee-splitting arrangement may be unconscionable if information specific to the circumstances indicates that fees are cost-prohibitive and preclude the vindication of statutory rights in an arbitral forum" while citing Randolph, 531 U.S. at 90, 121 S.Ct. 513, a vindication of statutory rights case. Faber, 367 F.3d at 1053; see also, supra n. 18; Jenkins, 400 F.3d at 877-78.
 
 
 [23]
 Other courts, both federal and state, have struck down class arbitration bars on similar groundsSee, e.g., Luna v. Household Fn. Corp. III, 236 F.Supp.2d 1166, 1178 (W.D.Wash.2002); Lozada v. Dale Baker Olds-mobile, Inc., 91 F.Supp.2d 1087, 1105 (W.D.Mich.2000); Discover Bank, 36 Cal.4th at 162-63, 30 Cal.Rptr.3d 76, 113 P.3d 1100; Powertel, Inc. v. Bexley, 743 So.2d 570, 576 (Fla. Dist. Ct.App. 1999); State ex rel. Dunlap v. Berger, 211 W.Va. 549, 567 S.E.2d 265, 278-79 (2002).
 
 
 [24]
 "Ambiguity — the possibility that a word or phrase in a contract might be reasonably and plausibly subject to more than one meaning — frequently occurs in the language used by the [contracting] parties to express their meaning. Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter. This rule is frequently described under the Latin term ofcontra proferentem, literally, against the offeror, he who puts forth, or proffers or offers the language.... Indeed, any contract of adhesion, a contract entered without any meaningful negotiation by a party with inferior bargaining power, is particularly susceptible to the rule that ambiguities will be construed against the drafter." 11 Williston on Contracts § 32:12 (4th ed.) (2005).
 
 
 [25]
 Comcast filed the motion to compel arbitration that has triggered this interlocutory proceeding. Presumably, Comcast could seek to withdraw that motion to compel if it does not like the conditions that now apply to the arbitral forum. We venture no opinion on how the district court should respond to any such development